83 C.C.P.A.(Patents)

## RIDER v. GRIFFITH.

### Patent Appeal No. 5108.

Court of Customs and Patent Appeals.

March 6, 1946.

W. B. Harpman, of Youngstown, Ohio (Emory L. Groff and Herbert M. Birch, both of Washington, D. C., of counsel), for appellant.

W. Lee Helms, of New York City, for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges.

BLAND, Associate Judge.

This is an appeal by the senior party, Rider, from a decision of the Board of Interference Examiners of the United States Patent Office in which priority of the invention defined by six counts was awarded to the junior party, Griffith.

The issue with which we are here concerned is originality. Rider, in his brief, states: "The issue is originality. Rider charges that Griffith derived the invention from him, through one, E. A. Lowe and/or S. T. Van Houten, while the latter and Rider were employed by The Automatic Sprinkler Company of America. Hence, Rider being the original and first inventor, whatever Griffith did inures to Rider's benefit."

The invention relates to a thermostat responsive to heat which will close a cir-

cuit and put into operation a fire alarm system.

The device is somewhat larger than a pocket watch, the lower portion of which, when attached to the ceiling, is in the form of a thin metallic, semi-spherical shell. On the inside of the shell portion is a V-shaped spring metal strip, one end of which is securely fastened to the wall of the shell, the other end of which is fastened to the shell by fusible solder. When heat of a certain temperature comes in contact with said thin outer shell the fusible solder quickly melts and the flexed spring presses upward on a metallic diaphragm in such a way as to make a circuit connection which brings about the sounding of the alarm.

The thermostat involved is an improvement upon a so-called "Lowe Thermoscope," the latter being so devised that when the air in the shell is heated to a certain temperature (and the parties refer to it as a "rate-of-rise" device) a diaphragm ·is actuated to perform the same functions as the device here involved. The improvement here rests for the most part in making the device more sensitive and quicker to respond to lower degrees of heat than the "Thermoscope" and is said to work on the "fixed temperature" principle.

The interference is between the application of the senior party, Rider, filed August·27, 1941, and the application of the junior party, Griffith, filed December 12, 1941.

At one time the interference involved three parties, Rider, Griffith, and S. T. Van Houten. The latter filed his application December 20, 1940.

In the Patent Office during the prosecution of the interference the party in interest of the Griffith application, being·the assignee of both the Griffith and Van Houten applications, was required to make an election as to which application it would rely upon in the interference. Van Houten's application, filed nearly one year before the Griffith application, clearly discloses and claims the instant invention, as does each of the applications of the other parties hereto. The Griffith application was chosen.

Five of the counts, 1, 2, 3, 5 and 6, originated in the Rider application and count 4 originated in the Van Houten application. All three of the applications, including drawings, descriptions and claims, are almost identical, which fact is regarded by the parties as of importance for reasons which will hereinafter appear.

Count 5 is illustrative and reads (the particular elements here involved being italicized): "5. A thermostat comprising an insulating support having a pair of circuit terminals mounted thereon and a contact member mounted therethrough, a metallic conductor connected to one of the said terminals and to the said contact member, a secondary metallic contact member connected to the other one of the said terminals and spaced apart from the said contact member, a metallic shell positioned on the said support, *a spring metal strip affixed to the said metallic shell by means of fusible solder, the said spring metal strip being retained in strained position and adapted upon the fusing of the solder to forcefully engage the said secondary metallic conductor and move the same into engagement with the said contact member, so as to complete a circuit through the device.*"

The contention of Rider is to the effect that he was the first to conceive the invention involved and that he was "in full possession" of the same as early as November 3, 1937, on which date he disclosed the same to one John A. Coakley, who was then vice president and is now president of the Automatic Sprinkler Company, hereinafter referred to as "Automatic," which manufactured devices like that at bar in Youngstown, Ohio, and maintained offices in the city of New York; and that subsequently Griffith derived the invention of his application from Rider.

Rider testified that on November 3, 1937, he showed a drawing of the device (Rider Exhibit 5) to Coakley and explained its operation. It might here be observed that its operation is so simple that it would be difficult to believe that any official of the company to whom it might have been explained would not be thoroughly informed as to the manner of its operation. Coakley's testimony relating to the circumstances of said alleged disclosure to him by Rider, which the board regarded as of vital importance to Rider's case, was throughly considered by the board and is the subject of spirited controversy here. The board pointed out that Coakley's testimony wholly failed to meet the requirements of the law relating to corroborative testimony as to conception and disclosure inasmuch as the models relied upon, Rider

Exhibits 6 and 23, which are particularly pertinent here, were made by persons who were not called as witnesses for Rider although they had been named in the Notice of Taking Testimony and Coakley's testimony did not identify these models clearly.

Coakley's testimony was not very definite and the board concluded that it was defective in that it fails to show that he, when first shown the device, understood the nature of the invention that was supposed to be disclosed by the models. He admitted freely that in the early part of 1938 he was not sufficiently versed in the art of fire protection to pay much attention to the operation of the models. He stated, however, that later in the third quarter of 1938 he did completely understand the operation of the Rider device.

█ From the decision of the board it is inferred that, as the issues of the case were there presented, it was thought necessary for it to pass only upon the question as to whether or not Rider had satisfactorily proved that he was in possession of the invention as claimed so that Griffith could have derived it from him. In our view of the case, since this issue is confined to originality, it will be sufficient for us to determine whether or not Rider has proved that Griffith derived the invention from him. The interesting analysis of the evidence by the board in holding that Rider failed to prove that he was in possession of the invention as alleged may properly, we think, be ignored here since it is immaterial whether Rider has met the requirements of the law to prove that he was, as alleged, in possession of the invention if it is held, as we do herein hold, that Rider has not satisfactorily shown that Griffith derived the invention from him.

█ Rider relies heavily on his Exhibit 5, which is a pencil drawing clearly disclosing the invention involved which has been notarized as having been signed by Rider on October 30, 1937. The importance of this exhibit, which has every appearance of being genuine, is minimized by Griffith with a suggestion that the lower portion of the same, which discloses the spring attachment (which is the gist of the invention in controversy), might have been added subsequent to the notarization. There is no evidence in the record or other circumstance which supports this contention, and if it were important (which it is not, in view of our conclusion) we would be constrained to hold that this exhibit is proper evidence for consideration on the question of conception on the part of Rider. October 30, 1937, is prior to any date to which Griffith is entitled. However, if it were held, contrary to the holding of the board, that Rider, in 1937, had conceived and made disclosure of the invention to Coakley, it would avail Rider nothing as the issue is here presented unless he also showed that Griffith derived the invention from him.

It is not claimed by Rider that if he has not proved that Griffith derived the invention from him, directly or indirectly, he is entitled to an award of priority in this case. His application was filed months after Griffith's device was in commercial production, of which production Rider was aware at the time he filed his application, and there is no contention on the part of Rider that he is entitled to an award of priority except, as hereinbefore stated, on the theory of originality.

Rider, at the time of testifying and for many years prior thereto, had been employed by Automatic. E. A. Lowe also was for many years in the employ of Automatic and had had wide experience as an inventor of devices similar to that involved here, including his "Thermoscope" which has been hereinbefore described and the patent for which device was assigned by him to Automatic's subsidiary company, the Airelease Corporation. Rider worked under Lowe, and S. T. Van Houten, heretofore referred to, was manager of Automatic's New York office and worked with Lowe.

Lowe worked for Automatic for 23 years, 1916 to 1939. In 1929 Lowe made a ten-year contract with Automatic to serve in the capacity of consulting engineer, certain phases of which contract were terminated in 1936 but it was agreed that Lowe was to continue to perform services in his capacity as consulting engineer until 1939, when his relations with the company were severed and he became otherwise engaged, as will be hereinafter referred to.

The record shows a number of activities on the part of Lowe from 1936 to 1939 relating to improvements made for Automatic devices as consulting engineer. At the time Lowe assigned his "Thermoscope" patent to Airelease it was making a somewhat similar device known as "Automatic Fire Detector."

Van Houten was manager of Automatic's New York office from 1924 to 1939. Dur-

ing 1937 and 1938 Lowe made his headquarters with Van Houten in the New York office of Automatic. In 1940 Lowe, Van Houten, Griffith, and others formed a corporation known as "Lowe Laboratories, Inc." Griffith was president of Lowe Laboratories, Inc., from 1940 to 1942. They produced a device embodying the present invention called "Spot Fire Detector." Lowe Laboratories, Inc., in 1943, changed its name to Fire Devices, Inc.

When Griffith's testimony was taken he was president of the Star Sprinkler Corporation, a competitor of Automatic, which began operations in 1923 and since 1941 has been manufacturing agent for Lowe and Lowe Laboratories.

Rider claims that on the 5th day of November, 1937, he disclosed to Lowe the involved invention by mailing to him, in New York (Rider being in Youngstown, Ohio), a copy of a sketch made by him (Rider) which completely disclosed the involved invention. Upon the original of this sketch, which is Rider Exhibit 7, is the notation, "Copy of this sketch sent E.A.L. 11/27/37. Please comment on patent possibility. H.N.R. Proposed Thermostat, 11/5/37. H. N. Rider." It is not claimed here that any letter accompanied this copy. The drawing with the said notation is regarded as a mailed communication. Although there was some misunderstanding on this subject during the proceedings it seems to have been cleared up here.

The record shows that on November 12, 1937, Rider wrote a letter to Lowe, the original of which is in the record and is known as Griffith Exhibit B, in which he enclosed a drawing and certain other matter not related to this invention, and called upon Lowe for his comment on patentability and that Lowe by letter, Rider Exhibit 8, answered the same on November 19, 1937. Rider does not claim that it was with this letter that the drawing disclosing the invention at bar was transmitted to Lowe but that this correspondence between himself and Lowe fixes the date at which time he claims to have sent the drawing disclosing the invention.

There is nothing in either of said letters of Rider and Lowe that suggests that he ever mailed a copy of Exhibit 7 to Lowe. Just why this correspondence is relied upon as proof by Rider that he sent Lowe a drawing disclosing the invention on that date is not made clear. It does show to some extent the relationship between Rider and Lowe at the time. Lowe denies having received the drawing. No other witness supports Rider's testimony that he sent the drawing.

Rider contends that not only was his invention disclosed by him to Lowe by the said drawing mailed as aforesaid, but that he also orally disclosed his invention and discussed it in Automatic's New York office with Lowe and Van Houten in 1938, and that Griffith became informed of the invention through Lowe and/or Van Houten. Rider points out that Griffith admitted that the invention was "foreign" to his line and urges that this circumstance is entitled to weight as having bearing on the question of the likelihood of Griffith being the inventor.

Lowe denies Rider's statement that there was any such conversation with Rider about the instant invention and Griffith affirmatively denies that he received the invention from either Lowe or Van Houten. Rider points to the fact that Van Houten was not put on the witness stand by Griffith and this fact is urged as being important since Van Houten not only knew about the activities of Automatic but was sufficiently informed about the invention as to file an application for a patent for the same in his own name. Griffith attempts explanation of this circumstance by stating that since Rider claimed that both Lowe and Van Houten were present when the New York conversation occurred it was thought sufficient to have Lowe only testify on this subject in rebuttal.

No witness corroborated Rider's testimony that in New York or elsewhere did Rider ever disclose the invention at bar to either Griffith, Lowe, or Van Houten.

It must be remembered that there was but one witness, Coakley, who testified in behalf of Rider. We have commented on this testimony, which went only to the question of whether or not Rider ever was in possession of the involved invention so that he could have disclosed it to any one.

Coakley testified as to the bad relations that existed eventually between Lowe and Automatic, and Lowe's integrity is severely criticised. He is charged by Coakley with having taken an invention from Automatic that belonged to it and later selling the same to it for $10,000.

Rider earnestly urges here that the various circumstances to which we have alluded, and a member of others not referred to but which are so relatively unimportant

as to require no special consideration, should be accepted as establishing that Griffith derived his invention from Rider and that these circumstances are corroborative of Rider's direct testimony on this question. Rider further urges that these circumstances relied upon here were not satisfactorily explained by Griffith and that they cannot be explained otherwise than against Griffith's interest.

Since it is obvious that the weight of the direct evidence on the question of originality is not with Rider, who bore the burden, Rider urges the application of the principles relating to circumstantial evidence. Since in this kind of case and in instances where fraud is the fact to be established the facts are difficult of direct proof and are usually shown by related circumstances, it is proper to here consider all the related circumstances shown in the record. Rinehart v. Gibson, 39 App.D.C. 358.

Proof of the fact inferred from circumstantial evidence cannot rest upon conjecture and speculation. Adair v. Reorganization Inv. Co., 8 Cir., 125 F.2d 901.

The circumstances relied upon to prove a fact must point to the existence of the fact to be established with reasonable certainty and may not be accepted as being fully probative of the fact to be proved unless they are consistent therewith and inconsistent with any other rational theory. Jones on Evidence, Civil Cases, 4th Ed., Vol. 3, Sec. 899.

"A theory cannot be said to be established by circumstantial evidence, even in a civil action, unless the facts relied upon are of such a nature, and so related to each other, that it is the only conclusion that can fairly or reasonably be drawn from them. It is not sufficient that they be consistent, merely, with that theory, for that may be true, and yet they may have no tendency to prove the theory. This is the well-settled rule." Asbach v. Chicago, B. & Q. Ry. Co., 74 Iowa 248, 251, 37 N.W. 182, 183.

It must be conceded that there are certain phases of the relations between the parties hereto which under other circumstances might strongly suggest the possibility that Griffith derived his invention from Rider; that is to say, they show a strong motive and an abundance of opportunity for Griffith to have derived his invention from Rider. But proof of motive and opportunity alone is insufficient to bring about the result sought by Rider. We said in Fersing v. Fast, 121 F.2d 531, 534, 28 C.C.P.A. Patents, 1318, "suspicions cannot supply the requirements of the law."

Rider stresses as having an important bearing upon the question of originality the following: "That he [Lowe] was a purveyor of ideas [is] too obvious for words from the undeniable fact that two substantially duplicate applications for patent stemmed from his admitted association with Griffith and Van Houten after he had broken with 'Automatic.' This plurality of applications from a common source makes the conclusion inescapable that since Lowe, the 'consultant' was directly responsible for these applications he was also responsible for communicating what Rider had disclosed to him."

The fact that two applications "stemmed" from Lowe's knowledge after he had broken with Automatic might have an important bearing if proved and if there was also satisfactory proof that Rider disclosed to Lowe. The latter fact is the important fact in dispute and is the crux of the controversy.

The evidence as a whole, taking into consideration the business relations of the parties and their admitted dealings with each other, as nearly approaches establishing a breach of faith between an employee and employer relative to the duty of an employee to assign to his employer, under certain circumstances, his invention as it does that Griffith obtained the invention from Rider. But we do not mean to say that upon this record either inference could properly be drawn. On this phase of the case the board very pertinently remarked: "While at first blush it may seem that Lowe and Van Houten were attempting to capitalize at the expense of their former employer, the Automatic Sprinkler Company, and perhaps escape the effect of Lowe's duty to assign improvements by having Griffith file an application on a competing device to that developed by Lowe for 'Automatic', the testimony when closely examined fails to establish that Rider was in possession of the invention so that he could disclose it to either or both Lowe and Van Houten and thus to Griffith. Thus no such inference can be drawn. Furthermore, only priority and not the contractural obligations of the parties can be considered here."

Rider has failed to meet the burden of proof on the question of originality and since a determination of this issue is conclusive of the case it follows that the decision of the board awarding priority of invention of the counts involved to Griffith must be affirmed.·

Affirmed.