83 C.C.P.A.(Patents)

## BEALL v. ORMSBY (two cases).
### Patent Appeals Nos. 5031, 5032.

Court of Customs and Patent Appeals.
April 1, 1946.

H. L. Kirkpatrick, of Boston, Mass., and John M. Mason, of Washington, D. C. (A. D. Salinger and J. L. Stackpole, both of Boston, Mass., of counsel), for appellant.

Walter E. Schirmer, of Buchanan, Mich. (John A. Dienner, of Washington, D. C., of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges.

GARRETT, Presiding Judge.

These are companion cases in which appeals were taken by the party Beall from decisions of the Board of Interference Examiners of the United State Patent Office awarding priority to the party Ormsby upon counts involved in two interference proceedings.

Both interferences were declared, so far as Beall and Ormsby are concerned, between the same applications. The Beall application, serial No. 287,424, was filed July 29, 1939, and is not, assigned. The Ormsby application, serial No. 256,947, which appears to have been assigned to his employer, the Clark Equipment Company, of Buchanan, Michigan, was filed February 17, 1939. We hereinafter refer to that company as the Clark Company.

Interference No. 78,350 (appeal No. 5031), in the final form declared by the examiner, was a three-party interference, an application of one George D. Wilcox being involved therein. His application was filed December 19, 1938. Hence, he was there the senior party, the order being, respectively, Wilcox, Ormsby, Beall. It appears that a one-half interest in the Wilcox application was assigned to one Frederick J. Haynes, and that they by instruments executed, respectively, on October 28, 1938, and December 12, 1939, granted the Clark Company an exclusive license for its use, it being a part of the agreement that the company was to prosecute the application and "develop the device."

Priority as to two counts (Nos. 8 and 9) of the three-party interference was awarded Wilcox in the board's decision rendered December 23, 1943, and neither Beall nor Ormsby appealed. Ormsby, in fact, is stated to have filed a concession of priority to Wilcox on those counts prior to the board's decision, and Beall, according to the board's statement, in effect, conceded priority on them to Wilcox.

As to the other counts (1 to 7, inclusive, 10 and 12) priority was awarded Ormsby, and Wilcox took no appeal. So, Wilcox is not a party before us, and the only part of his record (except as it is referred to in the board's decision) in the record before us is one documentary exhibit (Wilcox Exhibit 28) which is of no importance in deciding the issues before us.

The situation existing before the board, as of course, necessitated separate decisions by that tribunal and, although the issues as between Beall and Ormsby are substantially the same in both cases, we treat them separately.

Upon the merits two issues are presented before us, viz. (1) originality and (2) diligence on the part of Beall.

The primary issue is that of originality. Counsel for Beall insist that Ormsby derived his knowledge of the invention from Beall. If that contention be sustained it would end the case, so far as this court is concerned, but if not sustained the question of Beall's diligence must be considered because of the date awarded him by the board for conception, which award is not questioned before us by Ormsby.

### Interference No. 78,350, Appeal No. 5031.

In its decision in this case the board described the invention in controversy as follows: "The subject matter of this interference relates to a vehicle unit provided with an auxiliary engine to assist the main engine during periods of difficulty such as climbing hills and going through mud. It is desired to have a fully automatic system not under control of the operator to start and couple the auxiliary or booster engine during such periods of difficulty, to cut it out when a certain maximum speed is reached and also to prevent the booster engine from starting at very low speeds. To this end interlocking means responsive to the speed of the main engine driving element and also to some part of the induction system of the main engine is provided to actuate automatically the starting means of the booster engine and to clutch said booster engine to the propelling means. Additionally means is provided to prevent said interlocking means from being operative below a predetermined minimum speed."

Nine counts are involved. Of these, count 1 is illustrative. It reads: "1. In combination, a vehicle chassis having a main engine and propelling means, a secondary booster engine normally at rest, means for starting said booster engine from rest, a clutch for coupling said booster engine

to said propelling means, and interlocking means responsive to speed of a main-engine-driven element and also to some part of the induction system of said main engine for automatically actuating said starting means to start the booster engine from rest and clutching said booster engine to said propelling means whereby said booster engine assists said main engine in driving the vehicle."

With respect to the question of originality, the brief for Beall states: "The question before this Court is whether Ormsby derived his knowledge of the invention from the information which Wilcox received from Beall and which Wilcox' partner Haynes, and also Wilcox himself, gave to the engineers of the Clark Company, including Ormsby, long before any date alleged by Ormsby as the date of his conception."

It is contended by Beall, in substance, that Ormsby derived knowledge of Beall's invention from certain sketches made by Beall and from certain letters of a Mr. George C. Arvedson. The history of this phase of the case is stated in the following taken from the decision of the board:

"With respect to the issue of priority herein, there appears to have been a certain amount of transference of ideas between the parties here involved. It appears that Wilcox, the senior party, conceived the idea of providing a booster engine to assist the main engine during periods of distress. He disclosed his ideas in this respect to one Elliott who from Wilcox's disclosue drew the sketch of Ormsby Exhibit 1, likewise Wilcox Exhibit 2. This sketch was shown to Ormsby and he readily admits having seen it and describes as his understanding of Wilcox's conception that it was Wilcox's idea to operate the booster engine in conjunction with the main engine by automatic means that would allow its power to augment the power for the main engine when this power was required and at proper vehicle speeds * * *. It also appears that Wilcox interested one Haynes in his idea and Haynes, who was treasurer of the Automobile Manufactureres Association, transmitted this knowledge to Reeves, vice president of the Association, asking if it would be possible for the Association to make a patentability search thereon. Reeves transmitted this information to Arvedson, manager of the patent department of the Association, who in turn gave the information to Beall, also employed by the Association, to make the search.

"A rough sketch of the device was also sent to the Association together with a letter discussing it, which is alleged to be Wilcox Exhibit 16 herein. The exact nature of the sketch transmitted is not clearly established but it appears that it was either a sketch like Ormsby Exhibit 1 or Wilcox Exhibit 17. At least it appears that it was one of this general nature, and disclosed no more than was shown in such exhibits.

"After Beall had received the sketch and discussion of the idea he made a search thereon and likewise became interested in the idea himself and to that end developed a system as shown in Beall Exhibit 9 which he disclosed to Arvedson on July 27, 1938. Likewise, through Arvedson a sketch, said to be like Beall's Exhibit 36 only having more detail thereon, together with a written description was transmitted to Haynes and through him to Wilcox and the attorney who prepared the Wilcox application herein. At the same time Beall also conceived the idea of using a clutch both as starter and clutch-coupling means for the booster engine and drawings similar to those exemplified in Beall Exhibits 13 and 14 were likewise transmitted to Arvedson to Haynes and in turn to Wilcox and the attorney who prepared the Wilcox application."

The foregoing is from that part of the board's decision dealing with the controversy between Wilcox and the other parties, and, as we understand the board's decision it was to the effect that the counts here involved were derived by Wilcox from Beall. At any rate, the board held that "as between Beall and Wilcox, Beall is the original inventor and Wilcox has failed to establish conception in himself," but as between Beall and Ormsby the board said:

"Beall also contends that between himself and the party Ormsby he is likewise the original inventor for the reason that the sketches and descriptions above discussed were transmitted by Haynes to the Clark Equipment Company, Ormsby's assignee, and therefore were seen by Ormsby together with other of the Clark engineers and hence indicate derivation by the party Ormsby.

"Ormsby flatly contradicts this contention. Ormsby readily admits that he saw the Wilcox sketch, Ormsby Exhibit 1. He, however, categorically states * * *

that he never met Beall or Arvedson and that no one ever placed in his hands any other sketch aside from Ormsby Exhibit 1. He states that he knew that other drawings existed and were in. the hands of Schirmer the Clark patent attorney and that they were even offered to him. He states however, that he refused to look at them because he was working with the Bendix people in the development of this control and wished to be able to say that he had never seen any drawings that influenced his mind on these controls.

"It seems to us that the testimony of behalf of the party Beall with respect to Ormsby merely indicates a possibility that Ormsby may have seen the sketches that constitute Beall's work on this subject. We are of the opinion, however, that the mere possibility of derivation is insufficient to establish as a fact that there was indeed such derivation.

"Considering the devices as suggested by Beall and Ormsby there are, of course, similarities as there would naturally have to be to involve the parties in an interference. There are, however, likewise prominent differences. As we understand the Beall record it was one of Beall's main ideas that his system should be such that no separate starter for the auxiliary engine would be used but rather this engine would. be started through a particular *tyle* of friction clutch by the main engine. No such feature is shown in Ormsby's conception. On the contrary, he uses a separate starter working through the various interlocked controls of the system. Likewise, it appears that in Beall's system up until such time as he had seeen certain of Ormsby's drawings, he operated the speed governor control from the speed of the main engine and not the speed of a propeller shaft as in Ormsby. These differences to our mind constitute strong circumstances indicating independent work by the party Ormsby. We believe, therefore, that as far as the record herein presented is concerned, the party Beall has failed to establish derivation by Ormsby. Under such circumstances, the issue in so far as it affects these two parties is one of straight priority."

The briefs for the respective parties analyze the invention with a minuteness of detail which we deem it unnecessary to repeat.

The original brief for Beall alleged, in substance, that the gist of the invention lies in what the brief designated as a three-switch control system, embracing (1) a high speed switch operated by a governor driven from the main engine, (2) a vacuum switch operated by vacuum, or lack of pressure, and (3) a low speed switch also operated by a governor driven from the main engine. In a subsequently filed supplemental brief, we find the assertion that the invention was in the combination of Beall's three control switches with the main and booster engines.

The original brief for Beall gave the following explanation of the operation of the system:

"These three switches are so related that when they are all closed the booster is started and cut-in and when a switch, such as the high speed switch or low speed switch, is opened, the booster engine is stopped, i.e., cut out.

"Thus, when the truck slows down when climbing a hill to less than 20 miles per hour, the high speed switch closes. The vacuum switch also closes because the driver in trying to maintain his speed opens the throttle to wide open position and the low speed switch is also closed. The booster is therefore started and cut in.

"When the speed of the truck rises to 35 miles per hour the high speed switch opens and the booster is cut out.

"When the speed of the truck drops below 10 miles per hour, the low speed switch opens and cuts out the booster, although both the high speed switch and the vacuum switch may be closed. When the speed of the truck rises to 15 miles per hour the low speed switch closes, and, if *both* the other two switches (the vacuum switch as well as the then-already-closed high speed switch) are also closed, the booster is again cut in." (Italics quoted.)

On behalf of Ormsby it is insisted that the invention as defined in the counts is not confined to "Beall's three control switches"; that no one of the counts calls for or requires "Beall's three control switches," and that the Ormsby system does not employ "Beall's three control switches."

Beall concedes that the specific switches of the respective parties are different but insists that the invention lay in the combination of switches and booster engine and this we think must be true. The specifications of both applications refer to switches and although the term is not used in the counts they are broad in scope and no

question as to the right of either party to make them has been raised.

 The question of originality is one of fact, and the burden rested upon Beall to establish derivation by Ormsby by a preponderance of evidence.

The record in the case is an elaborate one which has required much time for study and analysis. We have examined the evidence pertinent to the question with great care in the light of the briefs and arguments of counsel as well as in the light of the board's thorough analysis of it.

Counsel for Beall lay great stress upon the fact that the Clark Company, Ormsby's assignee, had in its possession, during at least a part of the time while Ormsby was working on the invention, certain letters and sketches, transmitted to it through Wilcox and Haynes, which are alleged to have been a disclosure of Beall's conception and point to the fact that, at the beginning of taking testimony on behalf of Beall, a demand was made upon Ormsby's attorney to produce certain letters and sketches, which demand was not complied with. It is urged that those circumstances strongly indicate that Ormsby did have knowledge of Beall's conception and used it in his work. We here quote Ormsby's testimony relative to this matter verbatim:

"Q. 44. Did you have anything available at the time other than the sketch Ormsby Exhibit 1 to work from? A. That was all.

&ast; &ast; &ast; &ast; &ast;

"Q. 346. Did you ever receive any further drawing from Wilcox or anyone else other than Bendix regarding the automatic control system on the booster engine? A. I have not.

"Q. 347. Did either Wilcox or Haynes ever place in your hands any other drawings than the sketch Ormsby Exhibit 1? A. They did not.

"Q. 348. Did anyone else ever place in your hands any other sketch? A. They did not.

"Q. 349. Did you ever meet Mr. Beall, Mr. Frank H. Beall prior to today? A. I have not.

"Q. 350. Did you ever meet George C. Arvedson? A. I have never met Mr. Arvedson.

"Q. 351. Did you know of the existence of any other drawings relating to the automatic control of the booster engine? A. I did.

"Q. 352. Who had those drawings? A. Mr. Schirmer.

"Q. 353. Did he ever offer them to you? A. He did.

"Q. 354. What did you do? A. I refused to look at them as I was working with the Bendix people in the development of this control and I wished to be always able to say that I had never seen any other drawings that would influence my mind other than the design of these controls.

&ast; &ast; &ast; &ast; &ast;

"Q. 360. Did either Mr. Haynes or Mr. Wilson ever discuss with you any other control than shown in Ormsby Exhibit 1? A. They have not."

Counsel for Beall allege that the foregoing testimony is "equivocal, to say the least."

 We do not so regard it, and it may be pointed out that there was no cross-examination of Ormsby on this point. The matter of the refusal of the demand made upon Ormsby's counsel for the production of sketches and papers does not seem to have been discussed by the board and it is not referred to in the reasons of appeal to us. Upon the record here presented we would not be justified in holding that counsel was not within his rights in declining to produce them, nor do we think the refusal to do so should be regarded as discrediting Ormsby's positive testimony.

Another contention made on behalf of Beall is that Ormsby disclaimed the Beall invention. This contention is argued at length in Beall's brief. It seems to be based largely upon a letter written by Ormsby's attorney to Arvedson (whose relation to the case is described in the board's decision, quoted supra) relative to the Wilcox application in which Beall does not appear to have been mentioned. We have carefully examined the record relative to this matter and think the contention is without merit. It could serve no useful purpose to elaborate upon it.

 It is obvious that determination of the question of originality turns, in the final analysis, almost wholly upon the testimony of Ormsby and we may not properly reverse the decision of the board unless we are prepared to hold that his testimony is unworthy of belief. We can find no justification for so holding. It is elemental, of course, that this court will not reverse the findings of fact made by the Board of In-

terference Examiners unless convinced that such findings are manifestly wrong. We are not so convinced in this case.

■ The second question on the merits of the case relates to Beall's diligence. He claimed, and the board awarded him, conception the latter part of July 1938, which was prior to the dates awarded Ormsby— September and October 1938. Ormsby does not contest the conception date awarded Beall but alleges, and the board held, that Beall failed to establish diligence during the critical period.

In his preliminary statement Beall did not allege reduction to practice by himself but, upon the theory that Ormsby had derived the invention from him, claimed the benefit of the reduction to practice by the Clark Company "in the first three months of 1939." This theory not having been sustained, Beall must rely upon his filing date of July 29, 1939, for constructive reduction to practice.

In his preliminary statement Ormsby claimed actual reduction to practice about February 1, 1939, and also recited constructive reduction to practive by the filing of his application on February 17, 1939. It is not clear from the Board's decision whether it awarded Ormsby any particular date for actual reduction to practice but this is immaterial since his filing date was prior to that of Beall. It was incumbent upon Beall, therefore, to establish diligence from at least just prior to February 17, 1939, up to his own filing date of July 29, 1939.

We quote the following from the decision of the board: "All that appears to have been done by Beall subsequent to his conception in July, 1938 was to make various sketches and suggestions for a short period in October, 1938 after various Ormsby drawings were transmitted to him and to again make various suggestions in February, 1939 after having seen a draft of the Wilcox application. He states that from the period of October to December, 1938 he thought the attorney for the Clark Company was going to write an application and he expected to hear from him at any time. * * * His activities between December, 1938 and July, 1939 appears to consist merely of a large amount of correspondence. * * * It does not appear to us that during this period of October, 1938 to July, 1939 Beall did anything towards reducing his invention to practice or in filing his application, nor do we believe that this inactivity may be excused by his expectations that an application would be filed in his behalf by the Clark Company."

The record amply supports the board's finding as to what Beall himself did during the critical period. This is not disputed before us by counsel for Beall. Obviously, his personal activities were insufficient to establish diligence.

Counsel for Beall, however, urge that his delay in filing an application was because he was led by Haynes and the attorney for the Clark Company who prepared the Ormsby application, to believe than an application would be prepared for him (Beall) "to sign and execute."

The specific statement in the Beall brief on this point reads: "The reason why Beall did not file his application earlier than his opponent is that he was led to believe by Haynes, and Schirmer of the Clark Company, in October 1938, that they would have an application drawn up for Beall to sign and execute, and later in February 1939 by the Clark Company alone, through its patent attorney Schirmer, that it would prepare an application for Beall to sign and execute."

Beall's contention upon this phase of the controversy has been somewhat perplexing to us.

That Beall was the prior conceiver of the invention is conceded. That his application embodying it was not assigned to any one is emphasized in an early part of his brief. In our opinion, there has been no showing of a relationship between him and Ormsby or between him and Ormsby's assignee (the Clark Company) which would justify a holding that he had any right to expect the attorney for Ormsby or the attorney for the Clark Company to prepare an application for him "to sign and execute." He was "on his own" as an independent inventor, and, as stated, laid stress upon this fact in the early part of his brief. We find nothing in the record to justify the claim that he was induced or persuaded by the Clark Company to delay in filing his application.

We are not convinced of error on the part of the board in holding, in effect, that his inactivity may not be excused by his expectations that an application would be filed in his behalf by the Clark Company.

Certain questions of a procedural nature arose before us which require notice and (in two of them) rulings.

(a) The certified consolidated transcript of the record in this and the companion case was filed in the office of the clerk of the court April 20, 1944. A few days thereafter, before it had been transmitted to the printer, counsel for Ormsby filed a motion to dismiss the appeal on the ground that it had not been perfected within the time fixed by the rules of the Patent Office and this court governing appeals. We considered the motion at chambers and denied it without prejudice to the right of Ormsby to renew it at the final hearing. It was renewed at the final hearing and has been again considered. It is found to be without merit and is denied.

[6] (2) No brief for Ormsby (appellee) was filed within the time specified by our rules for the filing of an appellee's brief, nor was any request for an extension of time presented to the court (see Rule XXVII, subparagraph 4, 35 U.S.C.A.Appendix), and before his brief had been received a motion was filed by counsel for Beall (appellant) that Ormsby be not permitted to file one. This matter was considered and, preliminary to the opening of the oral argument, we ruled that, it being a matter within the discretion of the court, the brief on behalf of Ormsby would be received and his counsel would be heard in oral argument. This action was taken not out of courtesy to counsel for Ormsby, but because the court felt it necessary to have the aid of brief and argument in studying the complicated records involved. In our ruling we criticized counsel for Ormsby for his default and expressed the hope that no such situation would again confront us. No further comment or ruling upon this matter is necessary.

■ (c) Counsel for Beall, during the oral argument before us, requested and was granted permission to file what may be designated as a supplemental brief and counsel for Ormsby was granted permission to file reply thereto by way of supplemental brief. Those were filed and a few days thereafter counsel for Beall filed a motion to strike certain passages from Ormsby's reply substantially upon the ground of irrelevancy. That motion provoked a reply by counsel for Ormsby. It seems to us that counsel for Beall, by presenting the motion to strike, sought to reargue questions which already had been fully argued and that it was done in that manner in order to avoid a request for permission to file another supplemental brief. We have disregarded all matters not relevant or pertinent to the issues and the motion of Beall's counsel to strike is denied.

The bickerings between counsel in this case, as illustrated by the above examples, have not been helpful to the court in passing upon the merits of the controversy. They have added to our difficulties and labors. We have, however, disregarded the inconsequential matters and reached the conclusion that upon the merits of the case the decision of the Board of Interference Examiners was not erroneous.

It is, therefore, affirmed.

Interference No. 79,688, Appeal No. 5032.

■ Five counts are involved in this interference of which counts 1 and 4 are illustrative. They read:

"1. In an automotive vehicle including a plurality of engines and propelling means, means for independently connecting said engines to said propelling means, control means for independently controlling the power output of one of said engines during normal operation thereof, means controlled by movement of said control means towards full power of position and to predetermined point in the range of movement of said control means to connect a second engine to the propelling means, and means arranged to prevent disconnection of said second engine during subsequent opposite movement of said control means towards low power position from said predetermined point.

"4. In an automotive vehicle including a plurality of engines and a propelling means, means for independently controlling the power output of one of said engines during normal operation thereof, means operated by a decrease in speed to a predetermined point for disconnecting at said predetermined point a second of said engines from said propelling means, including magnetic means arranged to prevent said last means from connecting said second engine by subsequent increase of speed above said predetermined point."

The issues here presented are substantially the same as those present in interference No. 78,350.

Counts 3, 4, and 5 were held by the board not to have been disclosed in the same Ormsby sketch which disclosed the counts in No. 78,350, but were held, we

think correctly, to have been disclosed in other sketches "at least as early as October, 1938." In both cases it was found that Beall was the first to conceive but Ormsby was the first to reduce to practice; that Ormsby was not shown to have derived the invention from Beall and that Beall had not established diligence during the critical period.

As in the other case, we are not convinced of error in the board's decision and the same is affirmed.

Affirmed.