48 CCPA

Horace S. DALEY and Lawrence J. Talarico, Appellants,

v.

Arthur J. WILTSHIRE, Appellee.
Patent Appeal No. 6687.

United States Court of Customs and Patent Appeals.

Aug. 11, 1961.

Rehearing Denied Nov. 17, 1961.

Floyd H. Crews, Darby & Darby, New York City, for appellant.

H. F. McNenny, D. W. Farrington, Richey, McNenny & Farrington, Cleveland, Ohio, for appellee.

Before WORLEY, Chief Judge, RICH, MARTIN, and SMITH, Judges, and Judge WILLIAM H. KIRKPATRICK.*

RICH, Judge.

This appeal is from the decision of the Board of Patent Interferences awarding

* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Judge

O'CONNELL, pursuant to provisions of Section 294(d), Title 28 United States Code.

priority to Wiltshire on two grounds: (1) that Daley et al. could not make the count in interference and (2) that Daley et al. derived the invention in issue from Wiltshire.

Wiltshire, the junior party, appellee here, was employed by Apex Electrical Manufacturing Company (hereinafter called Apex) to whom the application involved was first assigned, a later assignment being to the White Sewing Machine Company which purchased Apex in 1956. Wiltshire's application, Ser. No. 362,898, filed June 19, 1953, is entitled "Pressure Vessel and Method of Making the Same."

Horace S. Daley and Lawrence J. Talarico (hereinafter called "Daley" for short), appellants here, are the senior party by virtue of their application Ser. No. 324,344, filed December 5, 1952, entitled "Spherical Container for Fluid Medium Under Pressure With Winding and Method of Applying the Winding." It is assigned to Specialties Development Corporation, a subsidiary of Walter Kidde & Co., Inc. (hereinafter referred to as Kidde), the employer of Daley and Talarico.

The single count is directed to a reinforced spherical pressure vessel for storing fluid such as compressed air, under high pressure (3,000 p. s. i. working pressure). Generally speaking it may be used as an accumulator or merely as a storage vessel, and more particularly the record shows that the parties developed their respective vessels for holding compressed air which feeds the combustion chamber in a jet engine starter system for military aircraft. Although the specific devices of the parties are in some ways dissimilar, broadly they have certain elements in common which form the basis for the count.

Each vessel has an air-tight, spherical inner shell reinforced by windings to increase both the strength-to-weight ratio and the resistance to shattering upon impact of a bullet or the like. More specifically, the windings follow a particular pattern which contributes particularly to shatter-proofness. Each vessel has the usual fitting for connection to a conduit and each party begins a portion of the winding process by placing great circle windings [1] adjacent and tangential to the fitting which, for convenience, is called a "pole" and is said to be on the "axis" of the sphere. As the winding process continues, the great circle courses move away from the poles and gradually approach the so-called "equator" of the sphere.

The count reads:

"A vessel for storing fluids under high pressure, said vessel comprising an inner spherical shell, a fitting secured to said inner shell forming a port for entry and discharge of fluid, said vessel including an outer shell formed of a substantially continuous strand of flexible material wound about the inner shell in a plurality of layers of windings, each winding at least inboard of the fitting substantially following a great circle path and the innermost winding extending from a zone adjacent said fitting to a zone diametrically opposite said fitting and succeeding windings having progressively lesser extent between said zones."

"Inboard of the fitting" means inward of the flange of the fitting, in a direction toward the equator and away from the poles. It is apparently a negative limitation, when used with "at least," to exclude those strictly non-great-circle windings which Wiltshire uses to hold his fitting in place and prevent it from blowing out when the vessel is charged. "Lesser extent" means that the plane in which a great circle winding lies makes a larger angle with the axis passing through the poles and as this angle increases the windings lie in a zone which is bounded by a lesser axial distance from the equator. In other words, if the sphere were the earth, the "innermost" layers of windings would be parallel to

---

[1]. This merely means that the winding lies in a plane which passes through the geometrical center of the sphere.

the meridians, passing adjacent to the north and south poles and covering the entire globe. The intermediate layers of great circle windings would not cover the frigid zones and, finally, the outmost layers would cover only the equatorial and torrid zones.

A brief consideration of the machines for winding the pressure vessels of the parties will make the pattern more apparent. The Wiltshire pressure vessel, as disclosed in his application, has a rubber inner shell much like the ordinary bladder of a basket ball or the like, and a valve. A temporary, low melting point metal alloy, spherical core, which later is melted and poured out, supports the rubber inner shell while it is being wound and the winding begins by rotating the sphere about an axis passing through the fitting. Simultaneously, a traverse arm oscillates from one pole to the other, feeding and guiding strands of glass fibers which have previously been saturated with a polymerizable resin in its liquid phase. The time for one oscillation of the traverse arm is just slightly less than the time during which the sphere makes one complete revolution. The length of the traverse arm stroke determines the extent on either side of the equator that the sphere is covered by windings and, by gradually decreasing the stroke of the arm as layers of winding are being wound, the extent of the surface covered by the windings being applied is gradually decreased. A covering about ⅜ inch thick has many great circle windings each lying in a different plane. Since each successive individual winding or convolution overlies the next prior winding, as the winding progresses a visible ridge is formed on the surface of the sphere which spirals from each pole toward the equator due to the progressive shifting of the winding positions.

Daley's pressure vessel is a relatively heavy-walled welded steel sphere upon which piano wire has been wound. In Daley's winding machine, the sphere is supported along an axis which passes through a fitting, and a feeding arm or flyer rotates around the sphere, wrapping strands of piano wire in great circles. The winding process begins with turns passing adjacent the fitting. By slowly rotating the sphere around an axis passing through the fitting, a layer of individual windings or convolutions surrounds the exterior of the spherical metallic shell. Then, as winding progresses, the polar axis is gradually tilted with respect to the plane in which the feeding arm rotates, so that the great circle windings gradually approach the equator. As in Wiltshire's sphere, a spiraling ridge running from adjacent each pole toward the equator necessarily results from the winding process. Except for this ridge, the exterior appearances of the spheres of the parties are quite different because Wiltshire's resin-impregnated glass fibers form, after curing of the resin, a solid shell of windings whereas in Daley the wire, being stronger and heavier than the Wiltshire glass fibers, is not wound as densely and, as the wires do not become consolidated, the exterior "shell" resembles netting or a sort of thick wire mesh structure having substantial voids between the individual wire strands.

The complexity of this interference is indicated by the size of the printed record which has 984 printed pages, in addition to which there are hundreds of exhibits.

We shall first dispose of the right to make issue. The language of the count was patterned after Wiltshire's claim 19 and was suggested to both parties by the examiner. Both parties made it. During the motion period both parties attempted to change the count or add additional counts and each party moved to dismiss on the ground that the other could not make the count. Only Wiltshire's motion to dismiss on the ground that Daley could not make was decided at final hearing, the board granting that motion. The other motions, involving points not ancillary to priority, were not entitled to review at final hearing.

The examiner, of course, was of the opinion that Daley could make the count or the case would not be here. On the

motion to dissolve, appellee's argument was, inter alia, that the count limitation to "an outer shell" finds no support in the Daley disclosure of a wire winding. There were four other arguments but this was the only one the board accepted. In doing so the board recognized that the total limitation as expressed in the count is "an outer shell formed of a substantially continuous strand of flexible material wound about the inner shell." It refused, however, to read this as being satisfied by the winding alone and held that the term "shell" required something to hold the winding in place, such as "bonding, soldering, welding, stapling etc." though not requiring resin bonding as disclosed by Wiltshire. The board's view was that there was no "shell" unless there was a "wall capable of standing by itself and capable of being cut in sections identifiable as sections of a shell."

■ In view of the well settled rule that a count is to be construed as broadly as is reasonably possible, a rule recognized by the board but, we think, not applied by it, we are of the opinion that such a restrictive meaning cannot be given to the word "shell." The count calls for a shell "formed of a substantially continuous strand of flexible material wound about the inner shell," and those are the identical words used by Wiltshire in his claim 19 where the count originated. Even if we construe them in the light of the Wiltshire application, as the board felt it must but which we think is unnecessary for want of any ambiguity, they do not require a wall which will either stand by itself or which can be cut in pieces identifiable as sections of a shell. The count makes no reference to either of such concepts. We believe the board has read into the count something which is not there. A shell *formed of a strand of flexible material* is not necessarily capable of standing by itself or of being divided into discrete sections, and a shell so made is all the count calls for. We regard the above italicized clause as a modification of the term "shell" which has a bearing on what is meant by the term, which meaning is not necessarily that usually accorded to it. Wiltshire's "shell" as defined is made only of windings and we see no reason why Daley's outer covering "wound about his inner shell" is not equally entitled to be called an "outer shell."

■ The board's holding that Daley cannot make the count must be reversed.

There remains for consideration the other ground of the board's award of "priority" to Wiltshire, derivation of the invention from him by Daley. To keep the matter in proper perspective, this is not a question of "priority" except in the loose sense of that term as customarily employed in interference proceedings. The issue is more accurately described as the question of originality. Did Daley originate the invention of the count or did he derive it from Wiltshire through acquisition of knowledge of what Wiltshire had done as the board held he did?

■■ As indicated by the reference above to the size of the record, much has been said on the subject. In essence the finding of derivation is a decision by the board on questions of fact, what had Wiltshire done, what did he have, and what did Daley find out about it before the date on which he is entitled to rely. Our approach to this issue must, therefore, be on the basis of the law as typically stated in Beall v. Ormsby, 154 F.2d 663, 667, 33 CCPA 959, 966, another originality case, wherein it was said:

> "It is elemental, of course, that this court will not reverse the findings of fact made by the Board of Interference Examiners unless convinced that such findings are manifestly wrong."

It is appellants' burden to convince us. Notwithstanding the broad and emphatic assertion of appellants' counsel that *"There is no evidence in the case to support this holding and there is positive evidence to the contrary,"* we are not so convinced. The board found considerable evidence to support its decision and

devoted, in two opinions, a total of 25 pages to discussing it. While it is not to be expected that any discussion of this length could be produced without a flaw, it is scarcely so unsound as to justify appellants' criticism that the board's opinion reflects an "abberation," is "shocking" and "incredible." We cannot condemn the board's conclusions as to ultimate facts as manifestly wrong on the basis of a few statements about its own thought processes in reacting to the evidence, which appellants have selected for criticism. It would be strange, indeed, if no inconsistencies or minor errors could be found in 25 pages of discussion of a complicated record. The question, however, is whether the record as a whole supports the board's conclusion, so that it is not manifestly wrong.

We have carefully considered the board's opinions, the arguments and briefs of the parties, and the evidence. We see no useful purpose to be served by here reviewing in too great detail the entire matter. We shall review enough of the salient facts in the story to show that the board's conclusion is supported by evidence.

In the spring of 1951, Eclipse-Pioneer Division of Bendix Aviation Corporation (hereinafter called Bendix) approached Apex to develop a light-weight, glass-fiber, pressure vessel which was needed as a part for their jet engine starter project. The head of the Research and Engineering Department of Apex assigned the problem to Wiltshire who had been working with molded fiber glass and resin tubs for washing machines. By June of 1951 Wiltshire had definite thoughts as to how the pressure vessel should be made. It would have to have an "inner thin shell of aluminum to seal against air leakage through the fiber glass laminate" and the "shell will be in the form of winding the continuous glass rovings" which will "supply the strength against bursting." Certain government specifications regarding bursting pressures, working pressures and resistance to shattering were contemplated, as was the problem of constructing a winding machine and completion of the vessels for September delivery. Wiltshire, however, easily completed a small-scale, hand-operated device with which he wound string upon a wooden croquet ball by rotating the sphere while feeding the string by hand along the axis of rotation. Going on from the small, crude, hand-operated device, Wiltshire next built the so-called ½-size machine. It was much more refined and, instead of feeding the string to be wound by hand, it used an oscillating winding arm whose motion was automatically controlled by a barrel cam, the latter causing the winding arm to oscillate from pole to pole in step with rotation of the sphere. The ½-size machine also varied the length of the traverse stroke automatically by means of a cam, the shape of which had been determined by experimenting with the earlier machine.

About the time the ½-size machine was being developed, Mr. Scott, an Apex salesman who was dealing with Bendix, offered to deliver the fiber glass wound spheres to Bendix provided they would not have to guarantee that the rigid specifications would be met, as Apex was not equipped to perform all the necessary tests. Bendix ordered six tanks. Wiltshire designed and built the full-size winding machine, with which he wound some sixteen spherical pressure vessels on metal liners. Those metal-lined spheres, designated M–1 through M–16, were wound during the period November 1, 1951 to February 20, 1952. While they varied somewhat as to the type of resin impregnation and the method of curing, all the original sixteen spheres were wound in substantially the same manner. Numerous working and bursting pressure tests, as well as other destructive tests, as, for example, those to determine the glass content, were performed either at Wright-Patterson Air Force Base, at the Case Institute of Technology in Cleveland, or at Teterboro, New Jersey, by Bendix. In February, 1952, Dr. Nara of the Case Institute pressure tested tank No. 13 until it burst

at 6,800 p. s. i. and cycle tested tank No. 14 by initially loading it to 5,000 p. s. i. and then recharging it twenty-five times at 3,000 p. s. i. Tank No. 14 was "o. k." after this testing and was shipped to Teterboro on February 15, 1952. A Bendix report dated March 19, 1952, indicates that "tank (c)," later shown to be tank M–14 which was tested by Dr. Nara, "Passed the proof pressure test but failed after approximately 30 cycles during cycling tests." It was this vessel, M–14, which Bendix had at a meeting with Daley on March 24, 1952, whereat disclosure to Daley is alleged to have been made. The requirement of gunfire resistance remained and we will now review the evidence directed to the gunfire test.

One of the original sixteen spherical vessels, M–3, was subjected to a gunfire test at the Wright Air Development Center, Wright-Patterson Air Force Base in Dayton, Ohio, and the results of those tests were recorded by several parties independently. An Air Force "Memorandum Report," entitled "Informal Gunfire Test of Apex Fiberglass Storage Tank" and dated 8 February 1952, is of record. It says:

"B. *Factual Data:*

\*   \*   \*   \*   \*   \*

"3. On 21 November 1951 a fiberglass wound storage tank supplied by Apex Electric Manufacturing Company was filled with compressed air at 3000 psi. A 50 caliber armor piercing bullet was then tumbled into it. The bullet entered at 90° and left at 45° from the vertical axis of the sphere. (See Exhibits A and B). The entry was a slit approximately 1¼ inches long and ¼ inch wide. The exit was elliptical with the axis being approximately 2 inches by 2½ inches. There was no evidence of fragmentation.
"C. *Conclusions:*

"4. None, data merely submitted.
"D. *Recommendations:*

"5. A complete gunfire test should be run on this type of high

pressure storage vessel since it has wide applications in aircraft."

Several photographs of the vessel accompany the report. Wiltshire was also in Dayton for the gunfire test and an unsigned report, dated November 24, 1951, which Wiltshire testified he had written, after briefly setting forth the testing procedure, says:

"The Tank took the shot with no tearing of any kind. The Tank weighed 16# 1¾ oz. before test and the same after the test.

"All persons concerned stated that they had never seen a Tank that did not tear when fired as above."

An Apex "Progress Report," dated November, 1951, is directed to the various tests that had been performed on the four tanks that had been made as of that date and as respects resistance to gunfire says, "The gun fire test on one tank shows that no tearing or shattering takes place." Additional photographs of the vessel are of record. Furthermore, after the gunfire tests, M–3 was cut up for inspection and the parts of it are Wiltshire's physical Exhibits A–1, A–2 and A–3. Wiltshire also testified that gunfire tests at Wright Field were set up by Bendix personnel. One of the Bendix personnel present at the gunfire test was C. D. Flanigen, a senior project engineer, who was the person who "pulled the trigger on the gun" and was also one of the Bendix personnel at the March 24, 1952 meeting which Daley attended.

During February of 1952, Bendix specifications were changed, including a requirement that the tanks withstand 10,000 cycles of pressurization, a requirement which Apex's metal-lined vessels apparently could not meet, as evidenced by Dr. Nara's cycle testing of M–14. Apex, therefore, decided to develop a rubber inner liner which would be wound with glass fibers. However, Bendix had to meet delivery schedules for the starters and since they had previously used Kidde pressure vessels, either wire-wound cylinders or spheres which

were not wire wound, in development testing of the entire air system, Bendix requested Kidde to supply the needed vessels.

On March 24, 1952, at Teterboro, four engineers from Bendix met with Horace Daley and John Stock of Kidde. Stock was a "contract engineer" but not an engineer by education. It is his report which has been a principal but not the only source of information as to what was disclosed at that meeting. This report is entitled "Eclipse Pioneer Fiber Glass Containers Engine Starter Project." It says that he was following up on work originally started by Mr. Hall in supplying 875 cu. inch spheres which were solid-walled, non-wire wound spheres and it pointed out that "Eclipse is working with our steel bottles as well as with fiber glass bottles from another source * * *." It also says:

"The meeting was generally devoted to exchange back and forth of experience on fiber glass and steel containers * * *.

* * * * * *

"I don't know whether this is news or not however, Eclipse fiber glass bottles are being made by an outfit in Cleveland by name of Apex who they said got into the fiber glass business through using it for washing machine tubs, etc. Eclipse are apparently doing the designing and Apex only the manufacturing. Another note of interest is that Eclipse stated that the fiber glass bottles that they had obtained to date did not stand up under cyclings—the inner steel shell ruptured. *They showed us one as we were leaving, which I believe was one of the ones that had failed on cycling (although, it looked perfectly okay on the outside)* and if I remember correctly it had failed after 39 cycles. By contrast, they had cycled one of our steel bottles for 2,000 cycles satisfactorily." [Emphasis ours.]

When Stock was called as a witness for Daley he could not remember the details of the meeting. When asked "Did it have a metal liner?" he answered, "I don't know." When his attention was called to the statement in his report that "the inner steel shell ruptured" he responded, "I made notes of the conversation * * * and * * * one of the Eclipse people present must have stated those words exactly and I recorded them." He also answered "I don't know" to the two questions "What did Bendix tell you about fiber glass containers?" and "Did they tell you anything about how they were constructed?" On the other hand, he testified that the sphere which they were shown at the meeting looked "like an over-sized golf ball without a cover on it" but he couldn't recall, at the time he testified, how the windings appeared.

Daley testified that the "sum total" of the "exchange back and forth of experience on fiber glass" was a "discussion * * * on the subject of fiber glass * * * test results and to the effect that the testing on fiber glass was quite unsatisfactory to that date and that basically their problem was in the endurance life of the containers which was completely inadequate." He remembered being shown a container as stated in the Stock report and he testified that he recalled it as being the "equivalent of our 875 cubic inch steel sphere." He also testified that he "understood" it had a "metal liner of some sort that had caused failures" but that he couldn't see the liner because "You could only see the outside." He didn't remember "how closely we were actually to the sphere" and he didn't believe that "at a distance" you could tell whether it had been molded or wound but he said, "I must say in all fairness that I knew from being somewhat conversant with the subject that winding had been used in order to obtain any reasonable strength properties in fiber glass."

Of the four Bendix engineers who were present William J. Deitz, Jr., and C. D. Flanigen testified. They were called as rebuttal witnesses for Wiltshire. Deitz was assigned by Bendix to work on combustion starters at the plant at Teter-

boro during 1951 and 1952. He testified as to the contents of numerous Bendix progress reports which related to the starter project generally, including summary data on pressure vessels. These reports were written prior to the March 24th meeting, during the regular course of business at Bendix and copies were received by him. He was also somewhat acquainted with Kidde's spheres which Bendix had used. He was questioned specifically about discussion at the meeting but he couldn't recall the specific meeting as he had attended several with Kidde representatives.

Mr. C. D. Flanigen, a senior project engineer for Bendix during 1951 and 1952, was also present at the meeting and testified that the meeting with Kidde was to obtain air tanks that were necessary to meet their $20,000,000 starter project. Kidde had been contacted since they apparently were in a position to supply heavier, 29 to 34 pound, pressure tanks. He testified that prior to the meeting, Kidde had been told that fifty bottles were needed for early delivery but made it clear that Bendix preferred an 18-pound vessel, presumably Apex's, that still had a lot of bugs in it, and that therefore Kidde would probably only be needed to supply the 50 vessels and no more. These are the reasons why Bendix showed Kidde the Apex vessel at the March 24th meeting which Flanigen summarized when he said:

"* * * we made no bones about showing the fiber glass bottles to Kidde so they could judge for themselves as to how rough it would be for them to beat the competition in the long range future."

Referring to what Daley and Talarico did right after the March meeting, the board said:

"* * * there is no convincing proof that they did anything about reinforcing with a winding a spherical vessel, until immediately after said meeting of March 24, 1952. Then, they became extremely active. According to Daley's testimony before the *end of March* of 1952 they had 'a jury rig type of machine for winding spheres'."

We think the foregoing and other evidence adequately support the board's conclusion as to the originality issue against the charge that it is manifestly wrong. The board stated its final conclusions as follows:

"It appears to us, that the positive as well as the circumstantial evidence make a prima facie case that, interpreting the term 'outer shell' to be satisfied by the Daley *et al.* winding, Wiltshire was the original and first inventor of the subject matter of the count and that Daley *et al.* derived it from him. The burden, then, was upon the senior party Daley *et al.* to proceed with the evidence to rebut this prima facie case made by the junior party. * * [citing authority]. The senior party has failed to rebut it. Daley *et al.* have not shown that they were in possession of the invention before the Wiltshire container was disclosed to them. In fact the date claimed by them for conception, both in their preliminary statement and in their brief is more than a month after the date of said meeting. * *

* * * * * *

"* * * We believe that Wiltshire is entitled to prevail on this prima facie case of derivation of the invention by the senior party from him, and all other issues raised by the parties become moot."

The decision of the board awarding priority to Wiltshire is affirmed.

Affirmed.

KIRKPATRICK, District Judge, did not participate in decision.