Norman W. KIRSCHKE and General Electric Company, Plaintiffs,

v.

William C. LAMAR, Defendants.

No. 16434–4.

United States District Court
W. D. Missouri, W. D.

June 6, 1969.

Carter Kokjer, Kansas City, Mo., for plaintiffs.

Claude A. Fishburn, Kansas City, Mo., for defendants.

## FINDINGS, OPINION, AND JUDGMENT

ELMO B. HUNTER, District Judge.

This is an action under Tit. 35 U.S.C. Section 146 by a person dissatisfied with the decision of the Board of Patent Interferences on the question of priority to an invention. The invention in dispute is a self-cleaning combination dishwasher-oven. Defendant Lamar filed his application for a patent, serial no. 279,557, on May 10, 1963. Plaintiff Kirschke, General Electric's assignor, filed his application for a patent, serial no. 339,711, on January 23, 1964.

### Proceedings in Patent Office

The competing patent applications were placed in interference and assigned Interference No. 94,529. The Board of Patent Interferences received evidence, considered the matter, and ruled the question of priority in favor of defendant. The issues decided in the inter-

ference proceeding were defined in three Counts:

"Count 1

In a cooking appliance, an oven chamber in which foods are cooked, means connected with the oven chamber for supplying a washing solution, and means in the oven chamber for circulating the washing solution into contact with the interior surfaces of the oven chamber for cleaning said surfaces of grease splatters and drippings from the foods which have been cooked in the oven chamber.

"Count 2

A domestic oven comprising a cabinet structure and a cooking cavity formed therein by an oven liner and a front-opening access door, insulating means surrounding the oven liner, heating means provided for the cavity, control means for obtaining the desired level of cooking temperatures, means for introducing cleaning fluid into the cavity, and a fluid distributing means located within the cavity so as to remove any food soil and grease splatter lodged therein, and draining means cooperating with the cavity for removing the soiled fluids therefrom, and means for converting the oven cavity to a dishwashing compartment, said means including dish rack means support within the oven liner so that during the washing operation food soil may be removed from both the oven walls as well as from dishes loaded into the oven cavity.

"Count 3

The method of cleaning from the interior surfaces of an oven liner defining an oven cavity food soils accumulated thereupon during the previous carrying out in said oven cavity of normal food cooking operations in the normal food cooking temperature range extending from about 150° F. to about 550° F., said method comprising supplying cleaning fluids into said oven cavity, recirculating the fluids throughout the cavity at high velocity for a sufficient time to remove the food soil and grease splatters accumulated on the inner liner, removing the fluids from the cavity, supplying a rinsing agent into the cavity, and recirculating the rinsing agent to remove the cleaning fluids from the walls of the liner, and drawing off the rinsing agent from the oven cavity."

The hearing before the Board of Patent Interferences was held on November 4, 1966. Defendant did not present testimony at the interference proceeding, but instead relied upon the filing date of his patent application as a constructive reduction to practice. Plaintiff Kirschke contended that he should prevail because he had actually reduced his invention to practice by June 8, 1962.

Kirschke presented evidence at the interference proceeding that his idea of a combination dishwasher-oven came up several times at brainstorming sessions of engineers in General Electric's range department while he was the manager of that department. Kirschke related this idea to Raymond Dills, another General Electice engineer who was the manager of the Advanced Engineering Development Section. Dills, in turn, disclosed the idea to Paul Staples, an engineer in the range department, who suggested that two students in General Electric's Creative Engineering Program, Christian Charron and Lawrence Levine, be given the project of investigating the feasibility of this idea as their assignment under the program. This project was assigned to Charron and Levine early in 1962.

To test the feasibility of the project, Charron and Levine constructed two units. Unit No. 5093 was coated with an interior coating of teflon and was equipped with a spray arm dishwashing mechanism. Unit No. 5105 was coated with an interior coating of sodium silicate and was equipped with an impeller dishwashing mechanism. Staples assisted in the construction and testing of these units, both in the actual physical construction and testing of the machine and by the procurement of necessary parts and materials. Staples testified at

the interference proceeding that he had seen the machines wash dishes and that he had requested a baking test on the oven the results of which were reported in Kirschke's exhibit 9.

Neither Charron nor Levine testified at the interference. However, their report on the project was offered into evidence as Kirschke's exhibit 14 over the objections of defendant that it had not been properly identified, was not the best evidence, and was hearsay. There was other evidence introduced at the interference proceeding as to Kirschke's conception of the idea, his disclosure of it to other General Electric personnel, the construction and operation of the units, and the steps taken by General Electric to patent the invention.

In ruling for defendant, the patent board noted that all three Counts of the interference called "for cleaning said surfaces of grease splatters and drippings from the foods which had been cooked in the oven chamber." The board considered this to be a material limitation of the Counts and held that Kirschke had not demonstrated the reduction to practice of a self-cleaning dishwasher-oven as defined by the Counts. The board based its decision on the ground that no testimony had been presented as to anyone having seen the machine built by Charron and Levine operate to satisfactorily remove grease and food soil from the interior surfaces of the oven as required by the Counts. Accordingly, the Board of Patent Interferences awarded priority of the invention to the defendant.

Plaintiff Kirschke had the choice of either appealing to the United States Court of Customs and Patent Appeals or filing his action in this Court under Tit. 35, U.S.C. Section 146. Plaintiff elected to proceed in this Court with General Electric joining as a plaintiff.

### Summary Evidence at District Court Trial

At the trial plaintiffs offered additional evidence on the capacity of the combination units to remove grease splatters from the interior of the oven cavities. Levine testified about the work that he and Charron had done in the construction and testing of the units. They had cooked hamburgers and a pork roast in both units and then had conducted tests to determine the cleaning capacity of the units. Tests were also conducted with a standard oven soil. This was a combination of animal fat, catsup and cherry juice. The soil was smeared on the entire interior of the unit and then baked on for four hours at a temperature of 450° F.

The cooking of the pork roast resulted in heavy grease splattering throughout the entire interior of the oven. Levine and Charron then ran a cleaning test by taking out the oven racks and running the unit through a dishwashing cycle. Levine testified that this was done on numerous occasions and "nearly all the soil was cleaned right off." Cleaning tests with the standard oven soil were also conducted. Again Levine testified that after the washing cycle was completed "virtually all the soil that had been smeared and baked on had been washed off."

In response to a question as to what he meant by "virtually all", Levine stated that in the teflon coated unit (No. 5093) a residue was left on the bottom and in the crevices of the interior. Levine described this as a "wet glop" lying on the bottom of the unit and testified that it could be wiped up with a sponge. This residue was left in the bottom of both units. He testified that the reason for this was that during the drain part of the washing cycle the agitators in the dishwashing mechanisms were not turned in the correct direction so as to agitate the water and force it out an existing drain. The spray arm mechanism had several openings in the upper surface from which water was forced out under pressure to accomplish the washing action. Because this was a dishwasher designed in such a fashion that the dishes were always placed above the spray arm mechanism, the water was always thrown

in an upward direction and was never applied with any force to the bottom.

Levine testified that he had recommended a solution to this problem which was to put a hole or a series of holes on the under surface of the spray arm, thereby directing the water in a downward direction so that the bottom residue could be forced out the existing aperture in the bottom of the units. According to Levine these holes were never drilled in either unit 5093 or 5105. Hence, his recommended solution of the problem was not tried out.

Finally, Levine testified that he would have been available to give testimony at the interference proceeding although at that time he was no longer employed by General Electric. He stated that he had left a forwarding address, had exchanged Christmas cards with Charron, who was still employed at General Electric, and could have been located at the time of the interference proceeding.

Paul Staples, who had testified at the interference proceeding, also testified about the cleaning of grease splatters from the oven interior. He testified that he was involved in the roasting of the pork roast in unit 5093 and participated in a cleaning test after the roasting. The standard oven soil was also used in cleaning tests on both units on several occasions. He testified that in the test with the standard oven soil all of the soil was not completely cleaned off the interior of the oven. Some five to ten percent was left in the corners and bottom of the units. Staples also testified that he thought the problem could be solved by directing the water action in a downward direction. However, in response to a direct question, he stated that the necessary change in the washing mechanism so that the water would be directed downward was never made.

Richard Caslin, the patent attorney for General Electric's range department, was called to testify by the defendant. Caslin testified that all of the testimony concerning the cooking of meat and the cleaning test presented at the trial of this case had been available during the time of the taking of evidence in the patent proceeding. He stated that the reason plaintiff had not presented this evidence to the patent board was because he had relied too heavily on Kirschke's exhibit 14, the report prepared by Charron and Levine at the completion of their work on the dishwasher-oven project.

## DISCUSSION OF ISSUES

■ Plaintiffs' first contention is that the decision of the Board of Patent Interferences was clearly erroneous. Plaintiffs contend that Kirschke's exhibit 14 clearly established that the units operated to clean grease splatters and food drippings from the interior of the oven. Plaintiffs argue that this report was prepared in the regular course of business and was entitled to full credit as evidence of the work performed by Charron and Levine.

It is not readily apparent from the opinion in the interference proceeding what weight was given to Kirschke's exhibit 14. Defendant objected to the offer of the exhibit on the ground that it was hearsay and had not been properly identified. Plaintiffs' contention that the report is entitled to full credit as evidence of the work performed by Charron and Levine must be considered in light of this objection, and the reasoning and discussion concerning the admissibility and weight to be given reports of scientific research and tests contained in Teter v. Kearby, 169 F.2d 808, 36 CCPA 706 (1948) and Alpert v. Slatin, 305 F.2d 891, 49 CCPA 1343 (1962). These cases point out that such reports, even if required by a company and regularly kept in the course of business, contain the self-serving opinions and conclusions of one of the parties and must be considered in this light.

■■ However, even if the report is accorded full weight on everything contained therein, this Court is not convinced that the conclusion of the patent board is clearly erroneous as is required before its decision can be set aside. See: Morgan v. Daniels, 153 U.S. 120,

14 S.Ct. 772, 38 L.Ed. 657 (1894) and Radio Corp. of America v. International Standard Electric Corp., 232 F.2d 726 (3rd Cir. 1956).

There is no reference in Kirschke's exhibit 14 to the cooking of meat and the subsequent cleaning of the resultant grease splatters. The report does state that the oven would be virtually self cleaning and that the combination units had been demonstrated to be highly successful as self-cleaning ovens. However, these are conclusions and opinions of the person preparing the report which are not accompanied by factual descriptions of any cleaning tests conducted to clean off grease splatters.

The report does describe the cleaning test with the standard oven soil. The report states that the results of this test were excellent, but then proceeds to describe the five to ten percent residue left in the bottom of the units. Plaintiffs argue that this baked-on standard oven soil represented a more difficult matter to clean from the interior surfaces than grease splatters and food drippings, and therefore demonstrated that the unit would clean off the grease splatters.

The fact that a standard oven soil, which may be more difficult to clean, leaves a residue of five to ten percent does not establish that the combination units operated to satisfactorily clean grease and food splatters from the oven surfaces as required by the Counts in the interference. Accordingly, plaintiffs' contention that the decision of the Board of Patent Interferences was clearly erroneous and that they are entitled to judgment on the record in the patent office is hereby overruled.

Plaintiffs next contend that the additional testimony of Levine and Staples clearly establishes that the units did operate to successfully remove grease splatters from the interior of the oven and thereby demonstrates a reduction to practice entitling General Electric to an award of priority.

Before the issue of reduction to practice can be discussed, it is necessary to consider a threshold issue. This is the question whether the additional evidence is admissible in the consideration of this case. At the trial defendant objected to the introduction of this additional testimony on the ground that it was available to plaintiffs at the time of the interference proceeding and should have been presented at that time.

Plaintiffs contend that there was no effort on the part of General Electric to consciously withhold, suppress or otherwise to conceal the facts that tests of prototype models were carried out in detail in the spring of 1962 by Charron and Levine, and accordingly their testimony is admissible.

Plaintiff's contention is not completely borne out by the record in the case. During the course of the trial, the following exchange occurred between the Court and Mr. Kokjer, one of the attorneys for General Electric Co.:

"Plaintiff rests, Your Honor.

"The Court: Before you rest, may I ask, on my own, ask you to state in the record what you stated to me in chambers, with all counsel present. I want the record to indicate it's [not] *ex parte* because everyone is [was] present. But it does deal with the general subject of the objection that has been made by Mr. Lamar's counsel. It goes to the evidence that has been put in here, but was not put in before the hearing, before the Patent Administrative Hearing group.

"Mr. Kokjer: Yes, Your Honor.

"The Court: That statement, as I recall it, was that with regard to Mr. Staples, for example, witness Staples in this case, that he was used as a witness in that case, and that any further material that you obtained from him today, what would be your reason for not having obtained it before the Administrative Hearing?

"Mr. Kokjer: As I read the record, Mr. Staples was and did comment on the washing tests. He was not asked in de-

tail as to exactly what was done. He was not asked about cooking tests. This testimony given by Mr. Staples was not consciously withheld, was not suppressed, it simply was not dealt with nor covered at the time of the taking of his testimony.

"The Court: All right, sir. Now, with regard to witness Levine, he was not a witness at the time of the hearing before the Administrative Hearing Board, was he?

"Mr. Kokjer: That is correct, sir.

"The Court: And in my chambers with counsel all present you undertook to explain to me—let's see if I quote you correctly, that you simply did not think that his testimony was needed in the Patent Administrative Hearing, that you thought you had sufficient without him testifying, is that a fair statement?

"Mr. Kokjer: That's a fair statement. I think that's the company's position. I did not take the testimony personally.

"The Court: Yes, sir. He was available to the company. There wasn't any reason why he could not have been produced at the Administrative Hearing, but it was simply the company's decision that it didn't need his testimony, that there was enough about it?

"Mr. Kokjer: That is, I believe, the position, yes. Because the testimony of Mr. Dills, Mr. Staples, coupled with the report, which was made in the course of the business of the company, was regarded as sufficient evidence of what they were trying to prove along these lines.

"The Court: All right, sir. I appreciate your frankness and that statement. Then there is no further need to make a record about it. At this point then, we will show that your case is rested."

Later in the trial, Mr. Caslin, in response to questioning from the defendant's counsel, testified as follows:

"Q. (by Mr. Fishburn) Well, getting down to the facts, then, all of this testimony that has been brought out in this trial was available during the time of taking of testimony in the Patent Office Proceeding in Louisville in 1966, I believe? * * *

"A. Yes. May I explain?

"Q. (by Mr. Fishburn) All right. Now you can make your explanation.

"A. Since the information that we have brought forth to the Court today is here today, it must have been available then, because we have not manufactured any evidence. * * *

"Q. (by Mr. Fishburn) Why was not this evidence which Mr.—why was not this further evidence brought out at the taking of the testimony in the Patent Office Proceeding? * * *

"A. I would have to explain to the Court that it is because the Range Department patent attorney, namely myself, relied probably too heavily on Plaintiffs' Exhibit 14. I believe it is probably the best report of feasibility of an invention that I have ever seen in the fifteen, sixteen years, that I have been practicing patent law for the General Electric Company. I was so elated with the details of the object of the project, and the test conducted during the project and the results of the project, that probably I was overconfident, and, therefore, I rested my case before the Patent Office with the evidence that I had presented. * * *"

Under Tit. 35, U.S.C. Section 146, a party has the right to introduce additional evidence at the trial of the case in the district court. However, this section does not contemplate the withholding of pertinent evidence that was within the knowledge of and readily available to the parties at the time of the patent proceeding. The Board of Patent Interferences has been established by statute as a forum for the resolution of disputes such as the present one. As such, full disclosure, so far as is reasonably possible, to the patent board is necessary. A party should not be allowed to intentionally withhold part of the available and highly pertinent evidence from the Patent Board on its belief or conclusion that it is not needed to pre-

vail, and then on losing at the administrative level, seek to prevail in a subsequent trial by means of the withheld evidence. See the discussion and reasoning in Barrett Co. v. Koppers Co., 22 F. 2d 395 (3rd Cir. 1927); Jorgensen v. Ericson, 81 F.Supp. 614 (W.D.Mo.1949) and Eastman Kodak Co. v. E. I. DuPont de Nemours & Co., 284 F.Supp. 389 (E.D. Tenn. 1968).

From the testimony of Mr. Caslin and the statement of Mr. Kokjer, the Court finds that the testimony of Levine and Staples presented at the trial was within the knowledge of the plaintiffs and was available to them at the time of the interference proceeding, but was not used because they elected not to present it after mistakenly deciding that it was not needed to prevail. That the evidence was available to the plaintiffs is overwhelmingly established by the testimony at the trial. That it was highly pertinent and not merely cumulative is also clear. Levine testified that he had left a forwarding address and could easily have been located, as he was for this trial. Charron was still in the employ of General Electric, and Staples, who participated in the cooking and cleaning tests, actually testified at the patent proceeding.

No direct evidence was presented that the additional testimony was within the knowledge of the plaintiffs. However, the Court believes that this is a reasonable inference from all of the evidence and circumstances in the case. Mr. Caslin testified that he had made a conscientious effort to find all information pertinent to the interference proceeding. The summary (albeit conclusionary in certain respects) description of the cooking tests with the standard oven soil was contained in Kirschke's Exhibit 14, the Charron and Levine report. This should have led to further investigation of this issue. Charron and Staples, who both participated in the cleaning and cooking tests, were contacted by Mr. Caslin in his preparation for the interference proceedings. Caslin's statement that he rested his case with the evidence presented raises an implication that other evidence was known to him. All of the above factors combined with the statement of Mr. Kokjer concerning the availability and use of the evidence convinces the Court that the evidence was within the plaintiffs' knowledge, and the Court so finds.

That the plaintiffs elected not to use the evidence is also a reasonable inference from all of the circumstances. Caslin stated that he relied too heavily on Kirschke's Exhibit 14 and overconfidently rested his case. This in combination with Mr. Kokjer's statement supports the finding that plaintiffs consciously elected not to present this evidence to the Board of Patent Interferences.

By finding that the evidence was within the knowledge of the plaintiffs, was readily available to them, and was consciously withheld from the patent board, the Court does not mean to imply that the plaintiffs attempted to deceive the patent board or engaged in any bad faith misconduct. They merely failed to present their entire case at the interference proceeding. This is unfortunate, but for the reasons discussed above, the Court concludes that they should not now be allowed to present the evidence. Accordingly, the Court sustains defendant's objection to the additional testimony of Staples and the testimony of Levine, and hereby excludes it.

■ Without this evidence the defendant is clearly entitled to prevail on the question of priority. However, even if the additional testimony of Levine and Staples were admissible in evidence, the Court is of the opinion that the defendant must prevail because the plaintiffs have failed to demonstrate a reduction to practice even by a preponderance of the evidence.

The courts have on numerous occasions considered what is necessary to constitute a reduction to practice. The following essentials for a reduction to practice are listed in Revise and Caesar,

Interference Law and Practice, Vol. I, pp. 395–96:

"The following are the conditions which are essential to an actual reduction to practice:

"(a) The reduction, like conception, must have taken place in the United States.

"(b) The reduction to practice must have been made by the inventor himself, or by one authorized to do so either by the inventor or by one who acquired the inventor's rights to the invention.

"(c) The invention must have been embodied in a physical or tangible form.

"(d) The physical embodiment of the invention, which is relied upon as the reduction to practice, must show every essential feature of the invention as defined in the count of the interference.

"(e) The reduction to practice must demonstrate the practicability or utility of the invention.

"(f) The reduction to practice must have been appreciated by the inventor at the time it was made.

"(g) The fact that the reduction to practice took place must be sufficiently corroborated in point of time."

■ Of these essentials, (e) is the primary one in dispute in this case and will be the only one considered herein by the Court. In order to have a satisfactory reduction to practice proof of successful commercial use is not necessary. See Toledo Scale Corp. v. Westinghouse Electric Corp., 351 F.2d 173 (6th Cir. 1965) and cases cited therein. What is required is a demonstration of the invention's practical utility for its intended use. Actual performance is required of the function for which the machine is intended with a quality, extent, and character of operation sufficient to indicate its utility in the environment in which it is contemplated to be useful. See: Eastern Rotorcraft Corp. v. United States, 384 F.2d 429, 181 Ct.Cl. 299 (1967); Radio Corp. of America v.

International Standard Electric Corp., 232 F.2d 726 (3rd Cir. 1956); Toledo Scale Corp. v. Westinghouse Electric Corp., supra, and cases cited therein.

The demonstration that is required is one that the inventor's idea works, not that he has thought the matter out and devised something that ought to work and may work; but something that will work to accomplish its intended purpose. Farrand Optical Co. v. United States, 325 F.2d 328 (2nd Cir. 1963).

The plaintiffs have not met these requirements. There is no dispute with the decision of the Board of Patent Interferences that the cleaning of the interior surfaces of grease splatters and drippings is a material limitation of the Counts. This is an essential element of the invention in dispute, and plaintiffs must show that their invention operated to clean the interior of the oven units before they are entitled to a ruling of priority.

They have not done this. All the evidence that plaintiffs have presented and relied upon shows that a residue of five to ten percent of the oven soil was left in the crevices and on the bottom of the oven units, and the Court so finds. This is obviously an incomplete cleaning operation. Plaintiffs cannot show a complete reduction to practice until they demonstrate that their unit performs a complete cleaning job, including the draining off of the excess residue. Until this draining is accomplished they have not demonstrated the "practical utility" of their invention for its intended use. It is the opinion of the Court that this goes beyond a mere failure to show a successful commercial use. The machines, as constructed by plaintiffs, failed to perform one of their essential functions—that of successfully removing accumulated grease splatters and food drippings from the oven interior.

■ Plaintiffs introduced evidence that they had devised a solution to this problem. However, this solution was never attemped and there has been no demonstration that it would successfully solve the problem. Levine's testimony

was to the effect that he had recommended the drilling of one hole or a series of holes, "whatever it took" to solve the problem. Apparently no one was sure how many such holes would be required, or whether the drilling of these holes in the underside of the spray arm mechanism would give rise to additional technical problems, such as a need for increased water pressure to compensate for the additional openings, that would require additional work. A reduction to practice requires that the invention include every limitation of the Counts. More is required than the belief or expectation that the completed apparatus will successfully operate. Means for producing the desired results must be included. See discussion in Fredkin v. Irasek, 397 F.2d 342 (CCPA 1968). Plaintiff's recommended solution to the problem of the excess residue is not so obvious that construction and testing of it is not required.

The Court concludes that plaintiffs have not demonstrated a successful reduction to practice prior to defendant's filing date. Accordingly, it is hereby ordered that judgment in the above-styled case be entered for the defendant, William C. Lamar, and that the Commissioner of Patents issue defendant a patent pursuant to the provisions of Tit. 35, U.S.C. Section 146.

It is so ordered.