**Robert D. ANDERSON et al., Plaintiffs,**

**v.**

**Lowell M. ANDERSON and William D. Simmons, Defendants.**

**Civ. A. No. 75–530.**

United States District Court, District of Columbia, Civil Division.

Nov. 18, 1975.

---

Donald A. Gardiner, Jr., Arlington, Va., for plaintiffs.

Stuart J. Friedman, Washington, D. C., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN H. PRATT, District Judge.

### Findings of Fact

1. This is a civil action brought under 35 U.S.C. § 146 from a decision of the Board of Patent Interferences of the United States Patent and Trademark Office.

2. The plaintiffs are Robert D. Anderson, Alvin E. Herz, Clabeorn Jones, Harold G. Strickland, William K. Wilson and L. B. Foster Company.

3. The defendants are Lowell M. Anderson and William D. Simmons.

4. United States Letters Patent 3,621,659 issued on November 23, 1971 to L. B. Foster Company as assignee of Robert D. Anderson, Alvin E. Herz, Clabeorn Jones, Harold G. Strickland and William K. Wilson on an application Serial No. 840,619 filed in the United States Patent and Trademark Office on July 10, 1969 (Joint Ex. 2).

5. Application Serial No. 24,207 was filed in the United States Patent and Trademark Office on March 31, 1970 by Lowell M. Anderson and William D. Simmons (Joint Ex. 2).

6. Lowell M. Anderson assigned his interest in application Serial No. 24,207 to Ralph M. Parsons Company on March 30, 1970 at the same time he executed the patent application (Joint Ex. 2).

7. On March 28, 1972, application Serial No. 24,207 was rejected by the United States Patent and Trademark Office as unpatentable over Patent No. 3,621,659 (Joint Ex. 2).

8. Following the Official Action of March 28, 1972, Ralph M. Parsons Company, on July 19, 1972, elected not to continue prosecution of application Serial No. 24,207 and reassigned its interest in application Serial No. 24,207 to Lowell M. Anderson (Joint Ex. 2).

9. On September 28, 1972, Lowell M. Anderson, now owner of application Serial No. 24,207, together with William D. Simmons, copied claims 1 and 2 of Patent No. 3,621,659 claiming to be the first inventors of the subject matter of said claims and requesting a declaration of interference with Patent No. 3,621,659 (Joint Ex. 2).

10. The Patent Office declared the interference between application Serial No. 24,207 and issued Patent No. 3,621,659 on December 11, 1972, as Interference No. 98,153 (Joint Ex. 2).

11. That the counts of the interference correspond to claims 1 and 2 of Patent No. 3,621,659 reading as follows:

*Count 1*

The method of compacting soil comprising the steps of:

(a) driving a hollow, open-ended probe into the soil to be compacted embracing within the interior of the probe a substantial portion of soil to be compacted while continuously providing a vertical vibratory component of motion to said probe whereby said probe is driven into the soil, and the soil is compacted and

(b) extracting said probe while continuously providing a vertical vibratory component of motion to said probe whereby said probe is extracted and the soil compacted.

*Count 2*

The method of compacting soil as claimed in count 1 wherein a probe is driven and extracted in a regular pat-

tern over the area to be compacted. (Joint Ex. 2).

12. Both parties to the interference timely filed preliminary statements, took testimony and filed the required records in the Patent Office (Joint Ex. 2).

13. The Board of Patent Interferences of the United States Patent Office on February 13, 1975 issued a decision awarding priority of invention to Lowell M. Anderson, the junior party (Joint Ex. 2).

14. The senior party, Robert D. Anderson *et al.*, filed this action on April 11, 1975, under the provisions of 35 U.S.C. § 146 seeking a reversal of the decision of the Board of Patent Interferences.

15. The Vibro-Driver was first made available by L. B. Foster Company for driving sheet pile in 1962 (Joint Ex. 2, SR 59-60).

16. Sometime in 1963 L. B. Foster Company began driving caissons (large diameter pipe) using the Vibro-Driver. These caissons were driven and left in place. However, it was noted that some compaction occurred because successive pipes were harder to drive (Joint Ex. 2, SR 59-60).

17. As the L. B. Foster Company became more involved in caisson work, about 1966-67, (Joint Ex. 2, SR 109) the L. B. Foster field people reported to Al Herz that settlement and compaction were occurring (Joint Ex. 2, SR 47-48). There was compaction within and around the caissons (Joint Ex. 2, SR 134).

18. In some cases after the caissons were driven, the centers were bored out and concrete was poured into the hollow caissons, after which the caissons were removed, leaving the concrete in place. When the caisson was vibrated during pulling the concrete settled and compacted, whereas if the caisson were not vibrated during removal, the concrete was honeycombed, which is undesirable (Joint Ex. 2, SR 62-63). Test drillings were made on these concrete columns

and those that were vibrated were denser and better (Joint Ex. 2, SR 63), which led Robert D. Anderson and his associates to thinking about using this technique for soil compaction, particularly deep soil compaction (Joint Ex. 2, SR 63, 110).

19. As a result of these earlier observations, Al Herz instructed Clay Jones to record anything unusual happening to the soil during driving and removing of caissons on his next job, which happened to be at Athens, Ohio (Joint Ex. 2, SR 48).

*The Events at Athens, Ohio:*

20. In August and September of 1968, Case International was the contractor for a construction project in Athens, Ohio requiring the installation of columnar concrete foundations (Joint Ex. 1).

21. Robert Martin was general superintendent for Case International on this project and Kenneth Flesch was job superintendent (Joint Ex. 1).

22. Each foundation was installed by vibratorily driving a caisson (a large diameter pipe) into the ground, removing the dirt within the caisson and refilling the caisson with concrete, and then simultaneously vibrating and extracting the caisson before the concrete had hardened (Joint Ex. 1).

23. A Vibro-Driver was used as the vibrating drive means for the caisson. This piece of equipment was rented from L. B. Foster Company who also sent along a field specialist to give advice on how it was to be operated and to keep in proper repair. In this instance the field specialist was Clabeorn Jones, one of the inventors of the senior party Robert D. Anderson *et al.* (Joint Ex. 1).

24. During the installation work, Jones noticed soil settlement around the caissons and concrete settlement within the caissons as they were being driven and extracted (Joint Ex. 1).

25. Jones testified that the settlement consistently occurred around the caissons being driven and extracted and where the caissons were spaced at 7 or 8

foot intervals, the settlement was overlapping (Joint Ex. 1). He recorded the soil settlement around one caisson in his notebook as a sketch (SPX–17, Joint Ex. 1).

26. Al Herz, Jones' boss at the L. B. Foster Company and another of the inventors forming the senior party, testified that following completion of the Athens job Jones reported the settlement he had observed and showed and explained to him the sketch he had made in his notebook. The sketch shows soil settlement around one caisson being driven into the ground (Joint Ex. 1).

27. Martin and Flesch, the Case International superintendents, noticed soil and concrete consolidation or settlement as the caissons were driven into the soil and extracted (Joint Ex. 1).

28. Flesch felt that the settlement was an advantage to Case International because it permitted them to move trucks and machinery much easier on the fill (Joint Ex. 1).

29. Flesch affirmed that, during the Athens job, Jones had shown him the sketch which he had made illustrating the compaction around the caissons and that it represented the compaction which occurred (Joint Ex. 2, SR 191).

30. Martin also affirmed that the sketch represented what had occurred by way of compaction on the Athens job (Joint Ex. 2), although he had not seen the sketch until the time he testified (Joint Ex. 2, SR 235–36).

31. Flesch testified that Clay Jones had brought out the fact that the ground was settling and that they were getting compaction and a vibratory effect on the concrete as the casing was being extracted and that they were getting so much settlement that they had to bring in additional fill and to build up the concrete to their cut off elevation (Joint Ex. 2, SR 252–53).

32. Flesch testified that it was mostly through Clay Jones' efforts that they were able to satisfy the general contractor that they were getting sufficient consolidation of the concrete without separate vibration (Joint Ex. 2, SR 255–56). This effect was brought to his attention by Clay Jones (Joint Ex. 2, SR 269).

33. Neither Mr. Martin nor Mr. Flesch offered any direct testimony that Clabeorn Jones disclosed to him, prior to his own personal observations, that dishpanning would occur around vibratorily driven and extracted caissons or that dishpanning was indicative or suggestive of a systematic process of vibratory probing intended to or capable of compacting large areas of granular soil (SR 244–45, 263).

34. Neither Mr. Martin nor Mr. Flesch testified that Clabeorn Jones at any time correlated the phenomena he and they had observed with a concept of compacting soil according to the steps set out in the counts in interference, or that Jones at any time disclosed and explained such a concept to them.

35. The sketch (SPX–17) does not provide complete disclosure of the method recited in the counts since it only shows resulting external compaction and not the successive method steps recited in the counts. It, therefore, cannot serve as independent corroboration of the asserted conception by Mr. Jones.

36. The settlement of soil around the casing was considerable and extended out three or four or five feet from the casing to give a large dishing effect (Joint Ex. 2, SR 233, 238–39, 259–60).

37. The settlement of concrete within the caissons on vibratory extraction averaged five feet (Joint Ex. 2, SR 269–70).

38. Concrete is a slurry of aggregate such as sand and gravel with cement in water.

39. The soil at Athens was a sandy type soil with some dirt and clay but mostly sand and small pebbles (Joint Ex. 2, SR 260–61).

40. Robert Martin testified that the Athens job was Case International's first experience with a vibro hammer and that Clay Jones was the one who pointed out that the vibratory effect on

the casing would help them consolidate the concrete (Joint Ex. 2, SR 244).

41. No borings were ever taken by Case International or L. B. Foster Company at Athens following observation of the dishpanning to ascertain the depth and degree of any compaction which may have accompanied the observed dishpanning (SR 136, 240).

*The Events at Pascagoula, Mississippi:*

42. During the period 1968–1969, Lowell M. Anderson was employed by the Ralph M. Parsons Company as field superintendent, construction, on a project to construct a shipyard for Ingalls Shipbuilding Company, a wholly owned subsidiary of Litton Industries, at Pascagoula, Mississippi. Ralph M. Parsons Company was the prime or general contractor for the project (Joint Ex. 1).

43. The shipyard, as originally planned, was to include an assembly area and a wharf area. Since the soil in the assembly area was primarily clay, it was originally contemplated that steel bearing piles would be driven into the clay and the concrete slabs of the assembly area supported by these steel pilings (Joint Ex. 1).

44. As a result of estimates made during the latter part of 1968, it became evident that the plan to use steel piling supports would run double the budget estimate and the plan was scrapped (Joint Ex. 1).

45. At the suggestion of Edward M. DeBlanc, Jr., Litton civil engineer on the project, the clay was dredged from the assembly area and hydraulic sand fill pumped in to replace it (Joint Ex. 1).

46. During the course of the dredge and sand fill operation, it became evident that differential settlement of the sand when subjected to load would create a serious construction problem (Joint Ex. 1).

47. At about the same time another budget overrun problem arose in the original plan to construct the wharf area bulkhead from precast concrete sheet pilings. However, Curtis Allen, Litton design engineer, and Lowell Anderson suggested that consideration be given to the proposal sponsored by L. B. Foster Company which involved constructing the bulkhead by driving open ended pipe into the ground, filling the pipe with concrete and removing the pipe after the concrete had hardened (Joint Ex. 1). L. B. Foster Company sponsored this solution to the bulkhead problem because it wanted to sell Ralph M. Parsons Company the pipe and because it wanted to lease or sell a Vibro-Driver for driving the pipe.

48. The first step in connection with the proposal was to ascertain the feasibility of the L. B. Foster proposal and in October, 1968, representatives of L. B. Foster Company met with representatives of Ralph M. Parsons Company in Pascagoula (Joint Ex. 1).

49. Harold G. Strickland, New Orleans district manager for L. B. Foster Company, testified that on October 31, 1968, he introduced Robert D. Anderson to Lowell M. Anderson at Pascagoula and that Robert D. Anderson thereafter met with Lowell M. Anderson privately (Joint Ex. 1).

50. Mr. Robert D. Anderson asserts that he described the Vibro-Driver and the associated equipment necessary for use with the Driver and advised Lowell M. Anderson that "since they were going to be driving open-end pipe in that sandy condition of soil out there that he could expect and anticipate some compaction of the soil." (Joint Ex. 1, SR 103).

51. Lowell M. Anderson testified that he could not remember meeting with Robert Anderson in October, 1968, and that his recollection was that he first met Robert Anderson in February, 1969 (Joint Ex. 2, JR 62, 81).

52. Arrangements were made by Ralph M. Parsons Company to borrow a Vibro-Driver and a field specialist, William K. Wilson, from L. B. Foster Company for the conduct of a test to study the time and cost feasibility of the concrete filled pipe solution. The Conplex

Company was retained by Parsons to furnish the crane needed to support the Vibro-Driver and pipe during driving and subsequent extraction (Joint Ex. 1).

53. On November 27, 1968, the test was conducted under the direction of Lowell M. Anderson. A 36-inch diameter pipe of ⅜-inch wall thickness and 83 feet long was clamped in and held vertically by the jaws of an L. B. Foster Company Vibro-Driver which was itself supported by a crane. The Vibro-Driver vibrated the pipe about 64 feet into the sandy soil without difficulty. At that point, the pipe could be driven no further by the Driver and was extracted by the crane while the Vibro-Driver continued to vibrate. The pipe was next re-driven in the same manner about 30 feet away and again it penetrated to a depth of about 64 feet before it was vibratorily extracted. With each driving and extracting, considerable settlement of the sand around the pipe and several geysers in the settlement area were observed by Lowell M. Anderson and William K. Wilson (Joint Ex. 1).

54. D. Ralph Bird, resident engineer for Ingalls Shipbuilding Company, witnessed these wharf bulkhead tests and he also observed the settlement that occurred in the area in which the pipes had been driven (Joint Ex. 1).

55. Shortly after the test, Lowell M. Anderson recorded and reported the test results in a memorandum dated November 27, 1968 to H. M. Stein. In paragraph 5 of the memorandum, Lowell M. Anderson wrote:

"Considering the importance of consolidating the hydraulic fill behind the wharf and in the Assembly Area, it appears that a study of a vibratory method of inducing settlement should be made. The Vibro-Flotation System has been successfully used in similar material or a method using the Vibro-Hammer might be considered." (JPX 1).

56. Lowell M. Anderson testified that he observed the settlement around the pipes himself and William K. Wilson confirmed that Lowell M. Anderson was directing the test and was standing only 75 feet away from the pipe being driven. Nevertheless, Mr. Wilson testified that he called Lowell M. Anderson's attention to the compaction of the soil around the pipes during the test (JR 21-22, SR 168-71).

57. The wharf bulkhead tests were conducted and supervised by Lowell M. Anderson and the Ralph M. Parsons Company. Neither Mr. Wilson nor the L. B. Foster Company had any responsibility for the tests other than to furnish, maintain and advise regarding proper operation of the Vibro-Driver.

58. The testimony of Robert D. Anderson regarding his statements to Lowell M. Anderson on October 31, 1968 is uncorroborated by any other testimony or evidence of record.

59. Even if accepted at face value, the testimony of Robert D. Anderson regarding his statements to Lowell M. Anderson on October 31, 1968 does not evidence a complete disclosure of the method embodied in the counts in interference or an appreciation that the phenomena regarding compaction around individual caissons was indicative of or suggestive of a systematic process of vibratory probing intended to or capable of compacting large areas of granular soil.

60. The testimony of William K. Wilson regarding his statements to Lowell M. Anderson during November, 1968, is uncorroborated by any other testimony or evidence of record.

61. Even if accepted at face value, the testimony of William K. Wilson regarding his statements to Lowell M. Anderson during November, 1968, does not evidence a complete disclosure of the method embodied in the counts in interference or an appreciation that the phenomena regarding compaction around individual caissons was indicative of or suggestive of a systematic process of vibratory probing intended to or capable of compacting large areas of granular soil.

62. Thereafter, Lowell M. Anderson suggested to Ralph M. Parsons Company that a design test program be undertaken complete with pre- and post-compaction soil borings (JR 29, 109, 126–28). On or about January 1, 1969, Lowell M. Anderson prepared a detailed plan to test the soil compaction thesis (Joint Ex. 1).

63. The plan was reviewed by Litton and Ingalls (JP 6 indicates that the plan was in Mr. McCollum's hands at least as early as the Friday before the January 23, 1969 meeting, i. e., on January 17, 1969) and a revised plan, dated January 29, 1969 was ultimately submitted to Litton, January 30, 1969 (Joint Ex. 1).

64. The test program as originally laid out by Lowell M. Anderson called for three (3) pre-compaction borings, nine (9) probes on 15 foot centers using a Vibro-Driver and a hollow pipe, and three (3) post-compaction borings (Joint Ex. 1). The test schedule provided for test site layout during January 23–24, 1969, pre-compaction borings during January 31–February 3, 1969, vibratory probing on February 4, 1969, and post-compaction borings during February 6–8, 1969 (Joint Ex. 1).

65. This test program was approved by Litton-Ingalls between January 30 and February 4, 1969. Eustis Engineering Company, and specifically Mr. Charles Bragg a partner in that company, was engaged to do the boring. Simmons Steel Erection Company was retained to furnish the labor and cranes necessary to conduct the vibratory probes. The Vibro-Driver was leased from the L. B. Foster Company for $6,900/month (one-shift) or $13,500/month (three-shifts) together with a field service man, Clabeorn Jones ($125/day). The field service man was to function under the general direction of Ralph M. Parsons Company to assist in the use, repair and maintenance of the Vibro-Driver and, if requested, to operate the Vibro-Driver controls (Joint Ex. 1).

66. Clabeorn Jones testified that, on arriving at the test site, he discussed the test program with Lowell M. Anderson and told him that there would not be overlapping of compaction and settlement on probes spaced 15 feet and 10 feet apart because they were spaced too far apart (Joint Ex. 2, SR 197).

67. The Vibro-Driver arrived at the test site on February 3, 1969 and was unloaded and readied for operation the next day. Actual vibratory probing commenced on February 4 in accordance with a pre-planned probing schedule prepared by Lowell M. Anderson and embodied in a diagram of the zones of the test assembly area showing the locations of proposed probes in each of Zones A, B, C and D. Probing began in Zone A where earlier three borings had been made by Eustis Engineering to determine soil density and other soil characteristics. Using a 30-inch diameter, $\frac{3}{8}$-inch wall, 85-foot long pipe, the first probe was vibratorily inserted into the soil and the settlement within the pipe (9'2") and the time to reach no further penetration (3:10) was recorded. Thereafter, the pipe was vibratorily withdrawn. The second probe vibrated into Zone A 15 feet away from the first probe, settled the sand (7'4"), but could not be withdrawn. At this point, Lowell M. Anderson decided to suspend further operations in Zone A since it was the only zone in which borings had been taken, and to move operations to Zone B (Joint Ex. 1).

68. In Zone B, a 60-foot long caisson having a diameter of 30 inches and a $\frac{1}{4}$-inch wall was used to vibratorily insert 25 probes on 12-foot centers as shown in JPX 12. Settlement within the pipe was measured and recorded after insertion following which the pipe was backfilled with sand to original ground elevation prior to withdrawal. After vibratorily withdrawing each probe, the settlement within the pipe as a result of withdrawal was measured and recorded in a log. Total observed

settlement varied from 2′ to 18′ (Joint Ex. 1).

69. In Zone C, 9 vibratory probes were conducted using a 75-foot long pipe having a 30-inch diameter and ¼-inch wall thickness. The probes were inserted on 10-foot centers as indicated on JPX 12. Following insertion, the settlement within the pile and the insertion time was recorded in a log after which the pipes were backfilled with sand and vibratorily extracted. Settlement within the pipe resulting from extraction was also recorded. Total settlement for Zone C probes ranged from 6′10″ to 11′6″ (Joint Ex. 1).

70. Following Zone C, activity returned to Zone A where eight additional probes were vibratorily inserted and extracted on 15-foot centers using a 30-inch diameter, ¼-inch wall, 75-foot long pipe. The pipes were backfilled with sand to original ground elevation prior to extraction. Total settlement in Zone A varied from about 5′0″ to 15′6″ (Joint Ex. 1).

71. The last zone to be tested was Zone D wherein the probes were inserted on three-foot centers using a 30-inch diameter, ¼-inch wall, 75-foot long pipe. After the fifth probe, no more settlement occurred due to the densification of the soil which had taken place as a result of the first five probes. Approximately 4′6″ of settlement was observed in an 8′ x 8′ test area. Testing was completed on February 7, 1969 (Joint Ex. 1).

72. Throughout the February 4–7 test, the crane was operated by Richard C. Boykin and the crane operations supervised by James J. Dixon, both of Simmons Steel Erection Company. Both Mr. Boykin and Mr. Dixon took their direction from Lowell M. Anderson, who was in charge, or from Mr. William Simmons of Simmons Steel Erection Company (who took his direction from Lowell M. Anderson) (Joint Ex. 1).

73. As a result of the February 4–7 procedures, Lowell M. Anderson concluded that soil settlement was achieved and that the procedure would likely work to compact the sand in the assembly area. This conclusion was tenatively expressed in Lowell M. Anderson's February 19, 1969 test report which was prepared prior to receiving the results of Eustis Engineering's test borings (Joint Ex. 1).

74. Mr. Charles Bragg supervised the test borings made by Eustis Engineering in the assembly area. Borings were taken both before and after compaction. In his expert opinion, prior to vibratory probe compaction, construction could not have proceeded on the hydraulic sand fill in the assembly area without a settlement problem developing. As a consequence of the February 4–7 vibratory probing, the relative density of the sand fill had been increased 25–50% to about 75–100% relative density and the fill could then support construction without settlement. According to Mr. Bragg, the compaction efforts in the early part of February were "definitely successful" (Joint Ex. 1).

75. Mr. Bragg also compared the results attained with the vibratory probe soil compaction procedure with the results attained by conventional Vibro-Flotation, a completely different technique which was the only known method at the time for sand densification. The vibratory probe technique was "comparable to or superior to the vibroflotation method of densification." In addition, it was a considerably less expensive technique. Estimates of costs to compact the assembly area using vibratory probing were a little over one million dollars, while Vibro-Flotation estimates were about $10–12 million (Joint Ex. 1).

76. Mr. DeBlanc was present for the February 4–7 tests, and following the tests, prepared two reports thereon. Mr. DeBlanc corroborated the manner in which the tests had been conducted and confirmed that Lowell M. Anderson was the man in charge of the tests. Specifically, in his report he observed that Zone A consisted of 9 probes on 15-foot grid spacings; Zone B consisted of 25

probes on 12-foot grid spacings; Zone C consisted of 9 probes on 10-foot grid spacings; and Zone D consisted of 9 probes on 3-foot grid spacings. He also observed the settlement around the vibratory probes and noted that the settlement diameter was 20 feet; that settlement inside the pipe varied from 5 to 15 feet; and that the boring results showed that the sand was being compacted to 95–110% relative density as evidenced by the blow count data (Joint Ex. 1).

77. Subsequently, the vibratory probe procedure developed during the February 4–7 tests was employed to successfully compact the entire assembly area (JR 217–18). Initially, a module on 10-foot centers was used. However, ultimately a module on 8-foot centers with one probe in the center was adopted. Final compaction was completed in the fall of 1969 (Joint Ex. 1).

78. The February, 1969 tests at Pascagoula were made using an L. B. Foster Vibro Hammer. Clabeorn Jones, who prepared a daily log which was witnessed by Lowell M. Anderson daily (Joint Ex. 2, SPX 23), was the field specialist responsible for maintaining the Driver and advising as to its proper operation.

79. The values of the soil checks made by Eustis Engineering were reported directly to Lowell M. Anderson as field superintendent of Ralph M. Parsons Company who had engaged Eustis Engineering to do the work (Joint Ex. 2, Bragg Dep. pp. 18–19).

80. The actual values of the soil tests were the property of Ralph M. Parsons Company and were not disclosed to L. B. Foster (Joint Ex. 2, Bragg, Sept. 19, 1973 Dep. pp. 18–19). However, the fact of consolidation was evident from settlement on the surface and the soil tests simply give figures to the precise amount of settlement (Joint Ex. 2, Bragg, Dec. 19, 1973 Dep. pp. 9, 15, 17–20).

81. Prior to the test on November 27, 1968, Lowell M. Anderson had had no experience with the use of a vibratory driver (Joint Ex. 2, JR 9).

82. The February, 1969 tests were planned by and conducted under the direction of Lowell M. Anderson and the Ralph M. Parsons Company. L. B. Foster Company's role was as an equipment supplier to Ralph M. Parsons Company furnishing the Vibro-Driver and the services of Mr. Jones as a field specialist responsible for maintaining the Driver and advising as to its proper operation.

*Post-Pascagoula Events:*

83. During early 1970, before United States application Serial No. 24,207 was filed by Lowell M. Anderson and William D. Simmons, Lowell Anderson was asked by Robert D. Anderson to attend a meeting on March 4, 1970 at the office of Eugene F. Buell, patent counsel to the L. B. Foster Company. Only Lowell M. Anderson, Robert D. Anderson and Eugene F. Buell were in attendance. During the meeting, the circumstances surrounding the development of the soil compaction process were discussed (Joint Ex. 1).

84. Following that meeting, Lowell M. Anderson received a document prepared by Eugene F. Buell entitled "Statement of Lowell M. Anderson" for his signature (SPX 1). The document set forth, in its essential respects, that Lowell M. Anderson was not the inventor of the soil compaction process but that he merely took and used the suggestions of Robert D. Anderson, Clabeorn Jones and William K. Wilson regarding soil compaction using the vibratory probe technique (Joint Ex. 1).

85. Lowell M. Anderson refused to sign the statement. Lowell Anderson testified that he deemed it to be incorrect insofar as it stated in any way that he was not the first inventor of the soil compaction method (Joint Ex. 1).

86. Robert D. Anderson, in his testimony, stated that SPX 1 represented the statements made by Lowell M. Anderson at the meeting (Joint Ex. 1).

87. Eugene F. Buell testified that SPX 1 stated what Lowell M. Anderson told him and it was prepared immediate-

ly from his recollection and from notes taken during the meeting with Lowell M. Anderson and Robert Anderson (Record p. 16).

88. Eugene F. Buell further testified that he had an independent recollection of Lowell Anderson stating that he was not the inventor of the soil compaction process here involved (Record p. 16).

89. Subsequent to the meeting between Lowell M. Anderson, Robert Anderson and Eugene F. Buell, Lowell M. Anderson had a telephone conversation with Warren Kearns, who was at that time an employee of L. B. Foster Company, but at the time of his testimony was no longer employed by L. B. Foster Company (Joint Ex. 2, SR 4 and JR 63–64).

90. Warren Kearns testified that Lowell M. Anderson had talked with him after receiving the statement SPX 1 and prior to the signing of his application for patent and that Lowell Anderson had advised him that the content of the statement was not incorrect or erroneous but that he could not sign it because he was being threatened with suit by Parsons Engineering unless he signed a paper which Parsons had given him to sign (Joint Ex. 2, SR 5–10).

91. Eugene F. Buell testified that Lowell M. Anderson spoke with him immediately after calling Warren Kearns and advised him also that while the content of the statement SPX 1 was correct, he couldn't sign the statement SPX 1 because Parsons or Litton were threatening to sue him (Record pp. 16–18).

92. Mr. Buell testified that the purpose of the March 4, 1970 meeting was to permit him to determine whether Lowell M. Anderson was an inventor of the counts in interference. If he concluded that Lowell M. Anderson was a co-inventor of the counts in interference, Mr. Buell would have taken the appropriate action to have Lowell M. Anderson added to the then pending L. B. Foster Company application for patent. If he concluded that Lowell M. Anderson was the sole inventor, Mr. Buell would

have advised his client, the L. B. Foster Company, to abandon their application (R 13, 15).

93. Mr. Buell's testimony is not the statement of an independent witness. Considering all the circumstances in which it was given including the failure to offer it to the Board of Patent Interferences and Mr. Buell's close and continuing relationship with plaintiffs, the Court finds that Mr. Buell's testimony is something less than that of an unbiased and disinterested witness and the Court, therefore, accords it only limited weight.

94. Lowell M. Anderson admitted on cross examination that he had spoken with Warren Kearns and Eugene F. Buell about signing the application presented by Parsons but denied making any statements about SPX 1 (Joint Ex. 2, JR 64–65).

95. At the time of the meeting between Lowell M. Anderson, Robert Anderson and Eugene F. Buell in Pittsburgh on March 4, 1970, Lowell M. Anderson knew that Ralph M. Parsons Company was claiming the rights in his invention by reason of his employment agreement, whereas at the time of his testimony on August 24, 1973 he was the owner of the patent application by virtue of the reassignment from Ralph M. Parsons Company (Joint Ex. 2).

96. Mr. David Ralph Bird, Jr. testified that he also had been asked by Litton Industries to execute a patent application covering the vibratory probe soil compaction procedure but that he had refused (Joint Ex. 2, JR 25).

*Conclusions of Law*

1. The Court has jurisdiction over the parties and the subject matter of this action. 35 U.S.C. § 146.

2. The Board of Patent Interferences has awarded priority of the counts in interferences to defendants. The decision of the Patent Office is entitled to a presumption of correctness and regularity. *Vogel v. Jones*, 346 F. Supp. 1005 (D.D.C.1972); *Aqua-Chem,*

*Inc. v. Baldwin-Lima-Hamilton Corp.,* 167 USPQ 257 (N.D.Ill.1970).

3. The Court cannot overturn the Board's decision "unless the contrary is established by testimony which in character and amount carries thorough conviction." *Morgan v. Daniels,* 153 U.S. 120, 125, 14 S.Ct. 772, 773, 38 L.Ed. 657 (1894); *United States v. Szuecs,* 100 U.S.App.D.C. 24, 240 F.2d 886 (1957); *Esso Standard Oil Co. v. Sun Oil Co.,* 97 U.S.App.D.C. 154, 229 F.2d 37 (1956); *Abbott v. Coe,* 71 App.D.C. 195, 109 F.2d 449 (1939); *Polaroid Corp. v. Horner,* 197 F.Supp. 950 (D.D.C.1961).

4. The "thorough conviction" standard imposes a heavy burden on plaintiffs in an action under 35 U.S.C. § 146. *Union Carbide Corp. v. Traver Investments, Inc.,* 238 F.Supp. 540 (S.D. Ill.1965); *Shell Development Co. v. Pure Oil Co.,* 111 F.Supp. 197 (D.D.C.1953), *aff'd,* 94 U.S.App.D.C. 86, 212 F.2d 454 (1954). A mere preponderance of evidence is not enough to justify reversing the Patent Office. *Morgan v. Daniels, supra; Abbott v. Coe, supra.*

*The Asserted Conception and Reduction to Practice by Plaintiffs in Athens, Ohio During 1968*

5. Conception is fundamentally a mental act known only to its originator and, as such, it must be proven by evidence showing what the inventor disclosed to others and what the disclosure means to one skilled in the art. *Spero v. Ringold and Rosenkranz,* 377 F.2d 652, 54 CCPA 1407 (1967). The disclosure must be in such clear terms as to enable those skilled in the art to practice the process of the invention. *Field v. Knowles,* 183 F.2d 593, 37 CCPA 1211 (1950).

6. Before a conception of an invention may be availing to a party in an interference there are inescapable facts which must be established: (1) the conception must have occurred to the person claiming to be the inventor and must have been appreciated by the inventor at the time it occurred; (2) the conception must have been manifested or proved by disclosures in full and clear terms of an operative invention; and (3) the disclosure must be corroborated. I Rivise & Caesar § 111.

7. The contention that Clabeorn Jones was in possession of a conception of the invention after observing the driving and extracting of the caissons and recording it in his notebook as a sketch is without adequate support in the record.

8. There is no corroborated evidence that Clabeorn Jones ever disclosed the invention recited in the counts in interference to anyone. In connection with the asserted disclosure to Martin and Flesch, their testimony indicates that Jones did not disclose to them prior to the driving of the caissons that compaction would occur upon vibratory driving and extracting of the caissons. They appear to have witnessed the phenomena themselves and could not state that Jones had called it to their attention.

9. There is no testimony of any independent witness that Jones appreciated that there was any correlation between the compaction he observed and the concept of compacting soil according to the process of the counts, or that Jones disclosed or explained such a concept to anyone. The conception of a process does not begin and end with the observation of a phenomena. Rather, it necessarily includes a contemporaneous recognition of the applications of the observed phenomena and a disclosure to others sufficient to enable practice of the invention. *Kardulas v. Florida Machine Products Company,* 438 F.2d 1118 (5th Cir. 1971).

10. The testimony of Martin and Flesch is clearly insufficient to permit the conclusion that Jones' sketch (SPX–17) was employed by him as an instrument of disclosure to any independent third party.

11. As for the sketch itself, it does not provide a complete disclosure of the method steps recited in the counts

and falls far short of being sufficiently full and clear to enable one skilled in the art to reduce the invention to practice. Where drawings are relied on as evidence of the conception of an invention, they must show a complete conception, free from ambiguity or doubt, and be such as would enable the inventor or others skilled in the art to reduce the conception to practice without any further exercise of inventive skill. *Mergenthaler v. Scudder*, 11 App.D.C. 264, 1897 C.D. 724 (D.C.App.1897). The Jones sketch can hardly be said to meet this test.

■ 12. Jones' explanation of the sketch to his boss, in the person of Al Herz, is not probative evidence of conception. Mr. Herz, like Mr. Jones, is a co-inventor and one of the plaintiffs herein. It is well established that joint inventors cannot corroborate each others' testimony as to conception and reduction to practice. *Manny v. Garlick*, 135 F.2d 757, 30 CCPA 1008 (1943); *cf. Eastman Kodak Co. v. E. I. DuPont de Nemours & Co.*, 298 F.Supp. 718 (E.D.Tenn. 1969); *Waterman-Bic Pen Corp. v. W. A. Sheaffer Pen Co.*, 267 F.Supp. 849 (D.Del.1967).

13. Jones' legal pad (SPX–18) is not reliable evidence of conception, it being totally uncorroborated and insufficient to enable one skilled in the art to practice the invention without further inventive efforts.

■ 14. The method employed by Case International at Athens, Ohio, does not include all of the essential elements of the counts in interference. Therefore, even if pointed out and explained to others, it would not amount to a conception of the invention. A conception and reduction to practice must include all the essential elements of the counts. *Schur v. Muller*, 372 F.2d 546, 54 CCPA 1095 (1967); *Kirschke v. Lamar*, 300 F.Supp. 146 (W.D.Mo.1969), *aff'd*, 426 F.2d 870 (8th Cir. 1970). For this reason also, practice of the method employed at Athens, Ohio, cannot amount

to a reduction to practice of the counts in interference.

■ 15. An essential prerequisite to an invention is that the reduction to practice must have been made by the inventor himself or by one authorized to do so. I Rivise & Caesar § 134. Since the Court has found that the activities in Athens, Ohio, were the activities of Case International, and not the activities of Clabeorn Jones or the L. B. Foster Company, there was no reduction to practice by plaintiffs at Athens, Ohio.

16. The Court concludes that plaintiffs neither conceived nor reduced to practice the process set forth in the counts in interference as a result of anything that took place at or in connection with the activities at Athens, Ohio.

*The Asserted Conception and Reduction to Practice by Plaintiffs in Pascagoula, Mississippi, During 1968*

17. Plaintiffs never asserted before the Board of Patent Interferences that their activities during the wharf bulkhead test constituted either a conception or reduction to practice of the counts in interference.

18. The Court concludes that there is no corroborated evidence showing that William K. Wilson, plaintiffs' only representative at Pascagoula during the 1968 wharf bulkhead tests, ever correlated the phenomena he observed with the concept of compacting soil as set forth in the counts in interference or that he ever disclosed the method of the counts to others. Therefore, plaintiffs did not conceive the invention during the wharf bulkhead tests at Pascagoula.

19. The wharf bulkhead tests at Pascagoula, consisting of only two vibratory probes, and with no pre- or post-probe borings to substantiate that meaningful compaction was in fact achieved, does not amount to a reduction to practice of the method of the counts in interference. See, generally, *Tennessee Valley Authority v. Monsanto Chemical Co.*, 383 F.2d 973 (5th Cir. 1967); *Birmingham v. Randall*, 171 F.2d 957, 36 CCPA 780 (1948).

20. Even were the wharf bulkhead tests sufficient to constitute a reduction to practice of the counts in interference, the reduction to practice would not inure to the benefit of plaintiffs. A reduction to practice must have been made by the inventor himself or by one authorized by the inventor. Since neither the L. B. Foster Company nor William K. Wilson had any supervisory authority over the wharf bulkhead tests, and William K. Wilson's function there was only to maintain and advise with respect to proper use of the Vibro-Driver furnished by L. B. Foster Company, the tests were not conducted by plaintiffs and, therefore, cannot constitute their reduction to practice.

*The Asserted Reduction to Practice by Plaintiffs at Pascagoula During February, 1969*

21. The activities during the assembly area tests during February 4–7, 1969, were sufficient to constitute a reduction to practice of the method set forth in the counts in interference.

22. As at Athens, Ohio, and as during the wharf bulkhead tests at Pascagoula in November, 1968, the only functions of plaintiffs during the February, 1969 assembly area tests were (1) to furnish the Vibro-Driver and (2) to furnish a field specialist to maintain the Driver and to advise with respect to its proper operation. Plaintiffs neither conceived nor supervised the tests. Accordingly, plaintiffs' activities at Pascagoula are insufficient to credit them with the benefits of these tests. The reduction to practice at Pascagoula during February, 1969, does not inure to plaintiffs' benefit.

*The Derivation Issue*

23. In cases of originality, the burden of proving derivation by a preponderance of the evidence is on the party alleging it, whether he be senior or junior. *Beall v. Ormsby*, 154 F.2d 663, 33 CCPA 959 (1946); *Rider v. Griffith*, 154 F.2d 193, 33 CCPA 884 (1946).

24. There can be no derivation of an invention without a showing of prior conception on the part of one alleging derivation from it. *In re Whittle*, 454 F.2d 1193, 59 CCPA 887 (1972); *Goodrich v. Harmsen*, 442 F.2d 377, 58 CCPA 1144 (1971); *Egnot v. Looker*, 387 F.2d 680, 55 CCPA 782 (1967).

25. Plaintiffs have not demonstrated by corroborated evidence that they possessed a conception of the invention at any time prior to the filing date of their U. S. patent application, on July 10, 1969. For this reason, the process described in the counts in interference could not have been derived from plaintiffs prior to their filing date.

26. Even if the testimony of Robert D. Anderson regarding his statement of October 31, 1968 to Lowell M. Anderson is accepted at face value, Robert D. Anderson did not relate to Lowell M. Anderson the essential process steps of the counts in interference. Therefore, Robert D. Anderson's disclosure to Lowell M. Anderson was insufficient as a matter of law to constitute disclosure of the invention. Moreover, the testimony of Robert D. Anderson does not evidence that he possessed a conception of the invention at the time of his asserted statement to Lowell M. Anderson.

27. Even if the testimony of William K. Wilson regarding his statements to Lowell M. Anderson during the wharf bulkhead tests in 1968 is accepted at face value, the Court concludes that William K. Wilson did not disclose to Lowell M. Anderson the method of the counts in interference. Moreover, the testimony of William K. Wilson does not evidence that he possessed a conception of the invention at the time of his asserted statements to Lowell M. Anderson.

28. PX–5 (SPX–1) is evidence of neither conception nor reduction to practice by plaintiffs. At best it is a controverted statement as to what Lowell M. Anderson might have said during a March 4, 1970 meeting with Eugene F. Buell and Robert D. Anderson.

29. The Board of Patent Interferences gave no weight to the statement (PX–5, SPX–1). While the testimony of Eugene F. Buell before this Court bolsters the veracity of the statement, there remains no corroborated evidence of record that the process of the counts in interference was ever communicated by plaintiffs to Lowell M. Anderson. Even if Mr. Buell's testimony is credited at its full face value, plaintiffs still have not demonstrated by a preponderance of the evidence that Lowell M. Anderson derived the invention from any of plaintiffs or that plaintiffs ever possessed, prior to their filing date, a conception of the counts in interference.

30. Applying the standard prescribed by *Morgan v. Daniels, supra,* this Court cannot conclude that plaintiffs have made a showing on the issue of derivation which in character and amount carries thorough conviction. Therefore, this Court concludes that plaintiffs have not carried their burden of demonstrating that Lowell M. Anderson derived the invention from them.

31. In view of the conclusion that plaintiffs neither conceived nor reduced to practice the process of the interference counts prior to their filing date and that Lowell M. Anderson did not derive the invention from plaintiffs, the Court further concludes that the earliest date of invention on which plaintiffs can rely is July 10, 1969, the filing date of their application for patent.

*The Asserted Conception and Reduction To Practice By Lowell M. Anderson At Pascagoula*

32. During the November, 1968 wharf bulkhead tests at Pascagoula, Lowell M. Anderson twice directed the vibratory insertion into and vibratory extraction from the soil of an open-ended pipe. He observed the settlement around the pipe and evidenced by his November 27, 1968 memorandum a contemporaneous appreciation that the vibratory insertion and extraction of an open-ended pipe in sandy soil could form the basis for a soil compaction procedure. This recognition and corroborated disclosure of utility satisfies the minimum requisites of the act of conception.

33. If the wharf bulkhead tests and resulting memorandum in November, 1968, do not constitute a conception, then Lowell M. Anderson's creating and publishing his compaction test plan prior to January 17, 1969, successfully completes the act of conception.

34. During February 4–7, 1969, Lowell M. Anderson directed and conducted the tests he had planned during January. The circumstances surrounding the extent of Lowell M. Anderson's participation in the tests are adequately corroborated by the independent testimony of Edward DeBlanc, James Dixon, Richard Boykin, R. David Bird and Charles Bragg. The fact that meaningful compaction was achieved was substantiated by the tests conducted and results reported by Charles Bragg of Eustis Engineering Company.

35. The February 4–7, 1969 tests reduced to practice the method set forth in the counts in interference and the reduction to practice inures to the benefit of Lowell M. Anderson and defendants herein.

36. This Court is in accord with the conclusions reached by the Board of Patent Interferences and finds that priority of invention should be awarded to Lowell M. Anderson.

An Order consistent with the foregoing Findings of Fact and Conclusions of Law is entered this date.

## ORDER

The Court after a full trial on September 3, 1975, at which it reviewed the full administrative record, a joint statement of the parties as to stipulated facts, and additional oral testimony, has entered Findings of Fact and Conclusions of Law. Accordingly, it is this 18th day of November, 1975,

Ordered, that the decision of the Board of Patent Interferences be and the same is hereby affirmed; and it is

Further ordered, that judgment be and hereby is awarded defendant Lowell M. Anderson as the original and first inventor in each of the Counts of Interference No. 98,153.